MANNING CURTIS BRADSHAW
  & BEDNAR PLLC
Alan C. Bradshaw, #4801
Chad R. Derum, #9452
136 E. South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone:  (801) 363-5678
Facsimile:  (801) 364-5678
abradshaw@mc2b.com
cderum@mc2b.com

*Attorneys for Plaintiff*
*IHC Health Services, Inc.*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IHC HEALTH SERVICES, INC., a non-profit Utah corporation,<br><br>        Plaintiff,<br>vs.<br><br>ELAP SERVICES, LLC, a limited liability company,<br><br>        Defendants. | **COMPLAINT**<br>**AND JURY DEMAND**<br><br>Civil No. _____<br><br>Judge _____ |

    Plaintiff IHC Health Services, Inc. ("Intermountain") asserts and complains against

Defendant ELAP Services, LLC ("ELAP") as follows:

### PARTIES

    1.     Intermountain is a non-profit corporation organized and existing under the laws of

Utah, with its corporate domicile and principal place of business in Utah.

    2.     Intermountain operates 22 hospitals and 185 clinics located in Utah and Idaho.

3.      Intermountain's mission is simple and succinct: helping people live the healthiest lives possible.

4.      ELAP is a limited-liability company organized and existing under the laws of Pennsylvania, with its principle place of business in Chesterbrook, Pennsylvania.

5.       ELAP's business model encourages employers in Utah and other states to adopt ELAP's form of a self-funded welfare benefit plan (a "Plan" or collectively "the Plans") under which members are told they can visit any healthcare provider they choose and that they are only responsible for paying what ELAP says they should pay, rather than what the provider actually charges for those healthcare services.

6.      On information and belief, no member of ELAP is a citizen of Utah.

## JURISDICTION AND VENUE

7.      The court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity in the parties and the amount in dispute is over $75,000 exclusive of interest and costs.

8.      ELAP's intentional actions form a basis for personal jurisdiction.  For example, ELAP makes misleading statements to induce Utah employers to adopt a form of employment-benefit plan that uses ELAP's improper business model.  To induce employers to use ELAP, ELAP makes misleading statements, including the false statement that Intermountain will accept whatever ELAP determines should be paid for healthcare services, rather than what Intermountain actually charges.  ELAP encourages Plans and their members to obtain care at Intermountain facilities with the premeditated fraudulent intent of not paying Intermountain's billed charges as required under Intermountain's contracts with patients.

9.      Accordingly, ELAP wrongfully interferes with potential economic relations between Intermountain and the employers, the Plans, and the Plans' members (Intermountain's patients).

10.      The members of these Plans have sought, now seek, and will continue to seek healthcare services and incur healthcare costs within Utah, including at Intermountain facilities.

11.      ELAP intentionally and purposefully directs its conduct to occur within Utah, knowing that the injury resulting from its actions will be felt in Utah.

12.      Venue is proper in this Court under 28 U.S.C. § 1391 because this is the judicial district in which Intermountain is domiciled and resides and it is where a substantial part of the events giving rise to the claim occurred.

## GENERAL ALLEGATIONS

### Intermountain Provides Outstanding and Affordable Healthcare to Utah Citizens

13.      Intermountain's mission is to provide high-quality care at more affordable cost to its patients.

14.      In 2016, Intermountain served more than 1.4 million unique patients in its hospitals and clinics.  Of those patients, Intermountain estimates that more than 1.3 million live in Utah.

15.      In 2015, Intermountain admitted over half a million patients to its emergency rooms and approximately 137,000 patients who suffered from acute needs.

16.      Intermountain has been recognized as the one of the top five innovative healthcare providers in the nation.

17.    In 2016, Intermountain ranked number one in the nation for "companies across the value chain that demonstrate leadership in improving human life at sustainable costs," according to the Eighth Annual Healthcare Supply Chain Top 25 Ranking.

**Intermountain's Relationships with Patients and Health Insurers**

18.    Intermountain regularly enters into contracts with health insurers that allow patients to access in-network care and to receive discounts on medical services under terms and conditions that are mutually negotiated, consistent, and fair.  Health insurance is typical among Intermountain patients and most of the insurers who direct patients to Intermountain have a negotiated contract with Intermountain.

19.    These relationships between Intermountain and insurers are often called preferred-provider agreements.  Utah law authorizes and encourages these relationships and contracts, including pursuant to Utah Code Ann. § 31A-22-617.

20.    When Intermountain has negotiated preferred-provider contracts with health insurers, the rates decided between Intermountain and the insurers determine what amount Intermountain will accept as payment for the care provided.  These contractual arrangements allow Intermountain to collect less than its full billed charges, which Intermountain would otherwise be entitled to collect pursuant to the contract the patient signs with Intermountain upon admission to an Intermountain facility.  The contract between Intermountain and patients is called the "Patient Agreement."

21.    Intermountain's contracts with insurers benefit patients, the insurers, and Intermountain.  Patients benefit from negotiated discounts.  Insurers benefit because the negotiated rates limit total insurance risk and generate savings that can be passed on to patients

in the form of lower premiums, thus making the insurer more competitive in the market. Intermountain benefits because Intermountain can expect a particular level of patient volume and revenue that allows Intermountain hospitals to operate with necessary resources. This is particularly important for a non-profit institution like Intermountain that invests all of its margins back into its healthcare system.

22. Insurers are not required to enter into these contracts with Intermountain, but do so to better serve the needs of their members in the markets Intermountain serves.

23. Some patients (including those with and without insurance) are eligible to receive help through Intermountain's financial assistance program. Intermountain works hard to ensure patients are well-informed about that program, which is an important feature of Intermountain's charitable mission. Non-insured patients may also receive discounts for upfront payments or cash payments. Some patients qualify to finance medical expenses over time.

24. Patients remain responsible for Intermountain's billed charges pursuant to Patient Agreements but may pay less than such charges when enrolled in an insurance plan that has contracted with Intermountain for a discount, the patient is eligible for financial assistance or other approved discounting, or the patient is eligible for Medicare or other government-run payment programs.

### ELAP's Scheme to Freeload on the Back of Intermountain, Other Healthcare Providers, and Patients Who Pay their Bills

25. ELAP is not contracted with Intermountain under a preferred-provider agreement or any other contractual arrangement. Instead, ELAP markets itself as a new way to reduce healthcare costs for employers by representing that significant discounts can be realized without a contracted pricing agreement. ELAP decides for employers the discounts that should be

applied to Intermountain charges without any agreement with Intermountain to do so and promises Plans and/or enrollees in its plans they will not have to pay anything beyond what ELAP determines to "allow" as the maximum payment.

26.     The premise of ELAP's business model is that it knows better than medical providers themselves what health care should cost.

27.     Rather than contracting with Intermountain to obtain pricing discounts in exchange for providing Intermountain with a predictable volume of patients, or seeking to negotiate pricing in advance of visiting an Intermountain facility, ELAP's solution is simply to direct Plans and plan members not to pay Intermountain's billed amounts.  In fact, ELAP markets its business model to potential new plans by asserting that "The only way to pay less for health care—is to pay less for health care."

28.     The scheme works like this:  ELAP convinces employers that they can significantly slash health care costs if they sign on to ELAP's "repricing" methodology.  ELAP, either on its own or with the assistance of others who work at ELAP's direction, including third party administrators ("TPAs"), advises employers that they should abandon traditional insurance or traditional self-funded welfare benefit plans and should instead adopt ELAP's form of self-funded Plans.  These plans may be aligned with a TPA that can provide access to ELAP's "repricing" services.  Unlike traditional insurance policies that shift risk to an insurance company, the employer's self-funded plan collects contributions directly from employees, and uses that resource pool to pay health care expenses directly as costs of the Plan.  On information and belief, ELAP benefits from this arrangement through the collection of fees and/or other compensation received from Plans in exchange for providing these "services."

29.    When a Plan is affiliated with ELAP, it advises the Plan and Plan members that they can seek medical care from any provider they like, regardless of whether the provider has a contract with the Plan, and without regard to the provider's charges for those services.  These representations are misleading and include half-truths, including that ELAP fails to disclose that obtaining health care services under this scheme requires, as in the case of Intermountain's Patient Agreement, that the patient agree to pay the health care facility for all of its billed charges as a condition to receiving services and that, as a result, the patient is legally responsible for billed charges due to the absence of a preferred-provider agreement.

30.    After a member receives medical care (including resource-intensive, life-saving medical care), the Plan or its members are required to send their medical bills to ELAP (including through TPAs) for processing.  ELAP, however, does not pay the amounts a provider like Intermountain charges as would a traditional insurer.  Instead, ELAP unilaterally decides the amount ELAP thinks the provider should have charged, and it directs the Plan to send that amount to Intermountain as payment.  In exercising this role, ELAP calls itself the Plan's "Designated Decision Maker" ("DDM").

31.    The amounts ELAP pays are typically significantly less than Intermountain's billed charges.  ELAP justifies its insufficient reimbursements by correlating its payments to the amounts the government requires providers to accept under Medicare.  This is true even though ELAP is *not* a federal program, and it has no basis to insist that Intermountain accept publicly-funded pricing for private care.  ELAP also cannot (and does not) provide any of the benefits to Intermountain that incentivize healthcare providers to accept Medicare payments.  Such benefits include, but are not limited to, a consistent and long-term flow of patient volumes that are backed

by the assurance of payment built into federal entitlement programs.  ELAP has nothing to do

with Medicare, but it misleadingly references Medicare as a convenient excuse for justifying

Plan reimbursements that are far less than what Intermountain charges.

32.     Another critical feature of ELAP's scheme is that it tries to insulate Plan members

from paying the balance owing to Intermountain after applying ELAP's minimal payment to the

patient's billed charges (the "balance bill").  ELAP falsely tells Plans and Plan members that it

does not matter where patients receive care or how much the care costs because ELAP will step

in to "defend" them against any attempt by the provider to collect the balance bill.  ELAP's

statements are misleading and include half-truths. For example, ELAP fails to disclose that even

if ELAP pays for a defense it is the patient that has signed the Patient Agreement and remains

personally and legally responsible for billed charges.  This means, among other things, that those

patients with unpaid balances may be subject to collection activity and negative credit reporting.

ELAP also pursues litigation against providers in an effort to wrongfully deter providers from

such collections.  However, ELAP fails to disclose to patients that it files those lawsuits in the

name of the patient and that the patient will be personally subject to the exhausting demands of

litigation, including attending depositions, responding to written discovery, appearing in court

for hearings, and that judgment may be entered personally against the patient if a court finds the

patient is required to satisfy the outstanding payment amounts.

33.     ELAP's business model is built around the expectation that providers will simply

"give in" and accept the insufficient payments ELAP directs Plans to remit.

34.     ELAP markets its business scheme to employers with the claim that an ELAP self-funded Plan is the "perfect vehicle" to control health care costs and falsely claims its repricing methodology is "100% defensible."

**ELAP Knowingly Encourages Patients to Enter Contracts with Intermountain to Obtain Health Care Without Any Intention to Pay for that Care.**

35.     To further its misleading scheme, ELAP purposefully, willfully, intentionally and knowingly encourages Plan members—either directly or indirectly— to obtain services and enter into Patient Agreements with Intermountain, knowing that patients will not pay, as agreed, for the services rendered.

36.     Patient Agreements, executed upon admission to an Intermountain facility, obligate patients to pay the amounts billed for the health care services that are thereafter in fact provided at Intermountain's facilities.  In advising Plan members that they can obtain care wherever they like regardless of cost, ELAP necessarily encourages Plan members to sign the Patient Agreement as a condition of receiving health care services.  ELAP does so knowing that Intermountain relies on Patient Agreements to provide contractual assurance of payment for services thereafter in fact provided.

37.     ELAP has specifically targeted and solicited its services to attract Plans with members it knows to be Intermountain patients.  ELAP knows that the terms of Intermountain's Patient Agreements require the patient to pay the amounts Intermountain determines to be owed for the health care services actually provided.  Nevertheless, ELAP knowingly encourages Plan members to disregard the terms of Patient Agreements signed upon admission by falsely representing and/or implying based upon half-truths that Plan members are not violating the Patient Agreements, including stating that ELAP will step in and defeat balance billing.

38.     ELAP also knowingly and deceptively encourages Plan members to seek and receive care at Intermountain facilities by falsely inducing Intermountain to believe that patients will actually pay for services as agreed.  ELAP encourages Plans and/or Plan members to present proof of Plan coverage or benefits, knowing that Intermountain will rely upon misleading documentation as evidence that the patient is eligible for Plan benefits, while intentionally omitting that ELAP's administration of the Plan is specifically designed to prevent Intermountain from collecting the amounts the patient agreed to pay in the Patient Agreement.  To facilitate this deception, ELAP conceals its role as the so-called DDM at the time patients seek admission to an Intermountain facility.  At all relevant times, ELAP knows both that it will not pay the amounts Intermountain charges for the services and that it intends to interfere with Intermountain's ability to enforce Patient Agreements to collect anything beyond what ELAP decides it should pay.

39.     ELAP knows that once valuable care has been received, the entirety of the benefit of the health care transaction has been bestowed on the Plan member, leaving Intermountain with the burden of trying to collect the amount Plan members agreed to pay, but that ELAP neither intended to pay itself nor intended to tell a Plan to pay.  In this manner, ELAP fraudulently orchestrates the misappropriation and theft of health care services.

40.     ELAP's representations to Plans, Plan members, and to the market are false, misleading and deceptive.  ELAP and/or its agents have acted with malice when making statements that encourage Plan members to sign Patient Agreements with no intention to abide by their terms.  ELAP and/or its agents know that Intermountain will make available vast amounts of critical health care services to Plan members based on the false representation that

Plan members will pay as agreed.  ELAP simply hopes that providers like Intermountain will nonetheless accept the amount ELAP decides to pay, and not the amount Intermountain is owed.

41.     ELAP further misleads Plan members when it communicates with Plan members about their obligation to pay balance bills.  If a Plan member has a question about why it received a balance bill from a provider, ELAP advises that the provider is "seeking reimbursement in excess of what [the Plan] has already paid."  This statement is false.  Providers like Intermountain do not seek "reimbursement" from patients (the way Intermountain seeks "reimbursement" from insurers), but rather providers collect directly from patients the amounts patients have agreed to pay.  ELAP misleadingly suggests that the provider is seeking to recover an "excess" amount, when in fact the provider is seeking to collect the amount the Plan member promised to pay upon admission.

42.     ELAP also advises patients that the amount they "have to pay under [their] plan" is limited to the amount ELAP determines.  This statement is misleading and suggests that patients' financial responsibility to providers is determined by ELAP or the Plan.   The amount a patient is obligated to pay, however, is based on the contract between the provider and the patient, not the agreement between ELAP and/or its affiliated Plans.  A provider like Intermountain is under no legal obligation to accept the ELAP-determined payment amount as payment in full.  ELAP misleads Plans and their members into believing that patient financial responsibility is governed by Plan terms to which Intermountain is not a party and not the terms of the contract the Plan member signs with the provider.

43.     ELAP engages in these practices knowingly and deceptively.  On information and belief, ELAP intentionally keeps from Intermountain information that if provided at the time of

admission would alert Intermountain to ELAP's involvement as the so-called DDM.  ELAP

knows that withholding such information prevents Intermountain from making a rational

decision concerning whether to provide non-emergent services to ELAP-affiliated patients

admitted into Intermountain's facilities.  ELAP proactively hides its involvement as the alleged

DDM, knowing that if providers like Intermountain are able to detect ELAP's involvement,

Intermountain will not consent to admit Plan members as patients for non-emergent services

because ELAP's business model is designed to avoid paying for services as agreed.

44.     Although ELAP-affiliated Plan members are difficult to identify because ELAP

intentionally tries to shield its involvement, Intermountain estimates that it has treated hundreds

of ELAP-affiliated Plan members who have accrued millions of dollars in unpaid charges as a

result of ELAP's scheme and interference with Intermountain's collection efforts.   To this day,

ELAP is continuing to direct patients to Intermountain based on the business model described

herein.  However, because of ELAP's proactive efforts to shield and conceal its involvement in

health care transactions to providers like Intermountain, Intermountain cannot readily identify all

such transactions, their date of occurrence, and/or the extent of injury to Intermountain.

45.     Rather than direct plan reimbursements to align with Intermountain's charges,

encourage its members to pay their balance bills, discuss pricing and/or discounts with

Intermountain in advance of providing care, or otherwise pay Intermountain the amounts owed,

ELAP sues Intermountain to avoid the obligations of its Plan members, using its Plan members

as pawns.

46.     ELAP's misleading business model is the basis for "miracles . . . being created

today" according to one company that administers ELAP plans.

## FIRST CLAIM FOR RELIEF

(Intentional Interference with Existing and Potential Economic Relations)

47.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

48.     Defendants intentionally interfere with Intermountain's existing and potential economic relations by improper means, causing injury to Intermountain.

49.     Intermountain has existing and potential economic relations with ELAP-affiliated Plan members that make up a portion of the patient population Intermountain treats.

50.     Intermountain is the largest integrated health network in Utah.  Intermountain reasonably believes and expects that if Plan members are not affiliated with ELAP, they will be affiliated with another private insurer with whom Intermountain has a preferred provider contract or the patient and/or plan will pay as agreed.  Intermountain believes that many current patients now affiliated with ELAP plans were previously insured under health plans that contract with Intermountain.  Intermountain facilities are located in close proximity to major population centers in Utah and Intermountain reasonably expects it would treat such individuals as patients if they are not affiliated with ELAP.  Intermountain estimates that it treated approximately 45% of Utah's 3.1 million residents at its hospitals and/or clinics in 2016 alone.

51.     On information and belief, ELAP has induced employers to leave private insurance plans that have contracts with Intermountain, and instead affiliate with ELAP, either directly and/or through its agents.  ELAP has induced employers to do so with the false promise that their employees can go to any provider (including Intermountain providers), regardless of

whether there exists a preferred-provider contract with Intermountain, and that Intermountain will accept the ELAP-determined amount as payment in full.

52.     ELAP has interfered with Intermountain's existing and potential economic relations with patients by misleading patients and encouraging them to obtain care from Intermountain facilities without the intent to pay for such care as Patient Agreements require. Instead, ELAP fraudulently promotes the creation of a relationship between Intermountain and the Plan member in which the Plan member agrees to Patient Agreements in order to induce Intermountain to provide services for which ELAP never intends to pay and for which ELAP intends to prevent Intermountain from seeking payment from the patient in accordance with the Patient Agreement's terms.

53.     By hiding that ELAP assumes the role as "Designated Decision Maker" of the Plans, ELAP and/or its agents engage in deceptive conduct intended to shield from discovery the fact that Intermountain is being induced to provide medical services for which ELAP never intends to pay.

54.     If Intermountain seeks the remainder of the balance due under the Patient Agreements from Plan members, ELAP also institutes and funds litigation against Intermountain for the purpose of interfering with Intermountain's Patient Agreements, which ELAP encourages patients to sign knowing the contract will not be followed.

55.     Defendants' untruthful statements, deceptive actions, and misrepresentations are improper means that interfere with Intermountain's ability to form and/or continue economic relations with Plans and/or Plan members.

56.     Defendants' actions have injured, continue to injure, and will injure Intermountain in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Injurious Falsehood)

57.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

58.     ELAP and/or its agents have made false statements, misleading half-truths, and omissions to employers, Plans, Plan members, and Intermountain as described herein.

59.     ELAP acts and has acted with malice when making such statements.

60.     ELAP's statements result in special damages, including the balance bills that Intermountain is unable to collect from Plans and/or Plan members.

61.     ELAP's actions have injured, continue to injure, and will injure Intermountain in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (Fraud)

62.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

63.     ELAP has made representations concerning presently existing material facts to employers and/or Plan members, including that affiliating with ELAP will allow employees and/or Plan members to go to any provider (including Intermountain providers) regardless of whether there exists a preferred-provider contract with Intermountain and that Intermountain will accept the ELAP-determined amount as payment in full.  ELAP further represents that

employees and/or Plan members will not be personally responsible in the event that the provider

seeks to collect on a balance bill representing an amount beyond what ELAP determines the Plan

should pay.  ELAP represents to ELAP-affiliated Plans and/or Plan members, or otherwise leads

them to believe, that to obtain health care services at a facility (including an Intermountain

facility) no special arrangements are required and/or that the Plan member can or should sign

whatever documents and/or agreements that the facility may present (i.e., the Patient Agreement)

as necessary to gain admission to the facility and receive the health care services regardless of

the content of the agreements or the obligations imposed on the Plan member pursuant to such

agreements.

64.     ELAP's representations also include half-truths.  ELAP knowingly encourages

Plan members to disregard the terms of Patient Agreements signed upon admission by falsely

representing and/or implying that Plan members are not violating the Patient Agreements,

including stating that ELAP will step in and defeat balance billing.  In representing that ELAP

will step in to defend Plan members, ELAP intentionally omits disclosing that patients with

unpaid balances may be subject to collection activity and negative credit reporting and that legal

action related to collection activity is undertaken in the name of the patient and the patient is

personally subject to litigation demands, including potential entry of judgment against them.

65.     On information and belief, ELAP makes such representations to Plans and/or Plan

members through a variety of channels, including both physical and electronic advertising,

promotional and marketing materials.  ELAP further makes such representations through direct

communications with current and/or prospective Plans and/or Plan members, including through

communications transmitted across wires into Utah from other jurisdictions.

66.     ELAP's representations are false. At all times, ELAP knows that absent a preferred-provider contract, there is nothing ELAP can do to obligate Intermountain or any other provider to accept what ELAP determines the Plan should pay as payment in full.  Further, ELAP has known at all times that, even if ELAP pays for defense costs, it is the individual plan member, not ELAP, that is the party subject to any action brought to prosecute or defend the collection of balance billing by a health care provider.  ELAP knows that the individual Plan member, not ELAP, will be named in any lawsuit and that any and all collection activities are likely to be directed toward the Plan member, and not ELAP.  ELAP knows that, notwithstanding its efforts to provide a defense against balance billing collection, nothing requires a facility to accept what ELAP determines a Plan should pay and nothing prevents a facility from pursuing collection activity directly against the Plan member.  ELAP further knows that such collection activity may include adverse credit reporting by the health care provider, which ELAP has no unilateral authority to terminate or repair.

67.     ELAP's representations are also false because ELAP knows that facilities like Intermountain routinely require patients to execute admission agreements, such as the Patient Agreement, that obligate patients to pay for all health care services rendered.  Therefore, ELAP knows that when a member of an ELAP-affiliated Plan seeks admission to an Intermountain facility that they are required personally to represent that they will pay for all health care services rendered.  ELAP knows such a representation is false but encourages Plan members to make this representation to Intermountain as the essential step necessary to enable the patient to receive health care services.  ELAP knows the facility's charges will never be paid as billed, but leads

Plans and/or Plan members to believe that the charges will be paid in a manner not inconsistent with the promises made in the Patient Agreement.

68.     ELAP knows that its statements are false and/or that its statements have been made recklessly, knowing that there was insufficient knowledge upon which to base its representations.

69.     ELAP makes false representations to Plans and/or Plan members that are calculated to result in the execution of Patient Agreements containing promises to Intermountain that ELAP knows will never be kept.  The false promises made in the Patient Agreement are the direct result of ELAP's conduct, and are made at ELAP's direction and/or with ELAP's expectation that false promises will be made to Intermountain.  ELAP's false statements result in Plan members being deployed as instrumentalities in a fraudulent scheme calculated to induce Intermountain to provide valuable health care services.  ELAP knows that Intermountain will rely on the Plan-members' promise in the Patient Agreement to pay for such services and that Intermountain would not provide such services in the absence of an agreement to pay for the services.

70.     Furthermore, ELAP makes concerted and active efforts to conceal its role as "Designated Decision Maker" of the Plans.  ELAP and/or its agents engage in deceptive conduct intended to shield from discovery the fact that Intermountain is being induced to provide medical services for which ELAP never intends to pay.  ELAP promotes or encourages its Plans and Plan-members to display "member cards" upon seeking facility admission, which resemble traditional insurance cards, but intentionally omit any connection to ELAP.  Such cards are intended to give the false appearance of third-party financial responsibility for the promises to

pay set forth in the Patient Agreement.  ELAP knows such appearances are false but are intended to induce providers like Intermountain to provide services.

71.     As a result of ELAP's fraudulent representations, Intermountain has been induced to provide millions of dollars-worth of health care services to ELAP-affiliated Plan members. However, because of the nature of ELAP's fraudulent scheme, ELAP has interfered with Intermountain's ability to collect the amounts Plan members promised to pay upon admission to Intermountain facilities.

72.     Defendants' actions have otherwise injured, continue to injure, and will injure Intermountain in an amount to be determined at trial.

<u>**FOURTH CLAIM FOR RELIEF**</u>

(Negligent Misrepresentation)

73.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

74.     ELAP has made representations concerning presently existing material facts which are false, including but not limited to those statements alleged in the preceding claim for relief.

75.     ELAP has made false statements negligently.  ELAP knows or should know that its representations promote, induce and/or encourage individuals to seek and obtain medical care, including at Intermountain facilities. ELAP knows or should know that the essential prerequisite to receiving such care is that the individual will enter into an agreement (i.e., the Patient Agreement) with the facility (i.e., Intermountain) under which the individual promises to pay Intermountain's charges for the health care services rendered.  ELAP knows or should know that

neither ELAP, the Plan, nor the Plan member will pay for Intermountain's charges.  ELAP knows

that Intermountain likely would not accept non-emergent ELAP-affiliated Plan-members into the

facility if it, or a patient seeking non-emergent services, disclosed to Intermountain that the Plan-

member is associated with an ELAP-affiliated Plan.

76.     ELAP has made false statements for the purpose of inducing Intermountain to act,

including in the manner described in the preceding claim for relief.

77.     Particularly because ELAP makes concerted and active efforts to conceal its role

as "Designated Decision Maker" of the Plans, Intermountain has acted reasonably in ignorance

of the falsity of ELAP's statements, and/or statements made at ELAP's direction.  ELAP and/or

its agents engage in deceptive conduct intended to shield from discovery the fact that

Intermountain is being induced to provide medical services for which ELAP never intends to

pay.  ELAP negligently encourages the use of member cards that omit any connection between

the Plan and ELAP and which ELAP knows or should know are likely to result in leading

Intermountain to believe that the Plan-member is backed by a third-party payor who will assume

some or all of the responsibility to pay for the Plan member's health care as required under the

Patient Agreement.

78.     As a result of ELAP's fraudulent representations, Intermountain has been induced

to provide millions of dollars-worth of health care services to ELAP-affiliated Plan members.

However, because of the nature of ELAP's fraudulent scheme, ELAP has interfered with

Intermountain's ability to collect the amounts Plan members promised to pay upon admission to

Intermountain facilities.

79.     Defendants' actions have otherwise injured, continue to injure, and will injure Intermountain in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
(Declaratory judgment)

80.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

81.     Intermountain is entitled to a Declaratory Judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201.

82.     An actual controversy exists relating to the parties' respective legal rights and duties, and the Court may declare the rights and other legal relations of the parties.

83.     Intermountain requests the Court adjudicate and declare Intermountain's rights and ELAP's duties under the law.

84.     The declaratory relief should affirm that Intermountain has a right to turn away and not admit to an Intermountain facility any non-emergent Plan member for whom ELAP is acting as the Plan's so-called DDM.   To give effect to that right, the declaratory relief should further state that Plan members that execute Patient Agreements upon admission to an Intermountain facility for non-emergent services are obligated to disclose that ELAP has a role in determining the amount to be paid to Intermountain.

85.     The declaratory relief should further state that ELAP is obliged to stop misleading Plans and Plan members into believing that Plan members can visit Intermountain without abiding by Patient Agreements, that Intermountain will or must accept whatever ELAP decides to pay for Intermountain's services, and/or that the patients who sign Patient Agreements will

nevertheless have no financial responsibility to Intermountain beyond what ELAP determines the patients' financial obligation to be.

86.     The declaratory relief should further state that nothing ELAP does, has done, or may do, in its role as alleged "Dedicated Decision-Maker" can alter or limit Intermountain's rights pursuant to the Patient Agreement to collect the amounts patients agree to pay pursuant to the Patient Agreement.

## SIXTH CLAIM FOR RELIEF

(Preliminary and Permanent Injunction)

87.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

88.     Intermountain is entitled to a preliminary and permanent injunction that prohibits ELAP and/or its agents from communicating to Utah employers, Plans, or Plan members—either directly or indirectly—that they can visit Intermountain facilities without abiding by Patient Agreements, that they will not be personally responsible for the obligations under their Patient Agreements, and/or that Intermountain will or must accept whatever ELAP decides to pay for Intermountain's services.

89.     Intermountain is further entitled to a preliminary and permanent injunction that when ELAP has a role in determining the amount to be paid to Intermountain either ELAP, the Plan and/or Plan member must disclose that information to Intermountain before a member obtains healthcare services.

90.     Intermountain will suffer irreparable harm if the preliminary injunction does not issue because Intermountain will continue to be duped into providing valuable and scarce health

care resources to patients who have been led by ELAP to believe they have no obligation to pay for those services. This work is made more challenging because ELAP obscures its involvement and administering ELAP plans and Intermountain cannot detect which patients have no intention to pay for the services they receive. Intermountain faces a significant, but not easily quantifiable, administrative and operational burden in managing these cases and pursuing collections from ELAP-affiliated plan members for whom ELAP funds a legal defense even though the patient, not ELAP, is the party to the Patient Agreement with Intermountain. Intermountain is incurring ongoing costs for patients that ELAP has encouraged to visit Intermountain's facilities with no intention of paying as agreed, and Intermountain incurs significant costs in defending and prosecuting actions in which Intermountain seeks to collect amounts that Plan members agreed to pay in Patient Agreements, but where no such intention to pay ever existed.

91.  Intermountain also suffers irreparable harm because Intermountain undergoes additional costs trying to recover full payment, and ELAP purposely frustrates those collection efforts.

92.  The threatened injury to Intermountain outweighs any potential harm to ELAP.

93.  An injunction will stop false and deceiving statements and half-truths and allow Intermountain to have full and transparent information when deciding whether to admit patients.

94.  An injunction will benefit the public interest by preventing ELAP and/or its agents from facilitating entry into contracts ELAP has no intention to perform. The injunction will also benefit the public interest because it will ensure that scarce and valuable health care resources are not allocated to patients who promise they will pay Intermountain's charges when in reality no such intent to pay actually exists.

95.     Furthermore, Intermountain is likely to succeed on the merits of the case for the reasons set forth herein.

96.     Accordingly, Intermountain seeks the entry of a preliminary and permanent injunction.

## PRAYER FOR RELIEF

Intermountain prays for relief against Defendant as follows:

a.     For judgment in Intermountain's favor on the above causes of action.

b.     For the award of damages in an amount to be proven at trial.

c.     For interest on all amounts awarded as damages, at the applicable pre-judgment rate of interest.

d.     For declaratory relief under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 on the terms set forth herein.

e.     For entry of a preliminary and permanent injunction under Federal Rule of Civil Procedure 65 on the terms set forth herein.

f.     For punitive damages.

g.     For Intermountain's attorneys' fees and costs

h.     For further and additional relief as the Court deems just, proper, or fair.

## JURY DEMAND

Intermountain requests a jury at the trial of this matter.

DATED this 1st day of December, 2017.

MANNING CURTIS BRADSHAW
& BEDNAR PLLC


/s/ Chad R. Derum
Alan C. Bradshaw
Chad R. Derum
*Attorneys for Plaintiff*
*IHC Health Services, Inc. dba*
*Intermountain Health Care, Inc.*

Plaintiff's address:
36 South State Street
Salt Lake City, Utah 84111