MANNING CURTIS BRADSHAW
  & BEDNAR PLLC
Alan C. Bradshaw, #4801
Chad R. Derum, #9452
136 E. South Temple, Suite 1300
Salt Lake City, Utah 84111
(801) 363-5678
abradshaw@mc2b.com
cderum@mc2b.com

*Attorneys for Plaintiff*
*IHC Health Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IHC HEALTH SERVICES, INC., a non-profit Utah corporation,<br><br>      Plaintiff,<br><br>vs.<br><br>ELAP SERVICES, LLC, a limited liability company,<br><br>      Defendant. | **SECOND AMENDED COMPLAINT**<br><br>Civil No.  2:17-cv-01245-JNP<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Evelyn J. Furse |

      As permitted pursuant to the Court's Memorandum Decision and Order Granting in Part and Denying in Part Defendant's Motion to Dismiss with Leave to Amend (Dkt. 29), Plaintiff IHC Health Services, Inc. ("Intermountain") asserts and complains against Defendant ELAP Services, LLC ("ELAP") as follows:[1]

---

[1] This pleading is styled as the Second Amended Complaint.  The initial Complaint was filed on December 1, 2017 (Dkt. 2).  The First Amended Complaint was attached to Intermountain's Motion to Amend (Dkt. 26) as Exhibit 1 (Dkt 26-1).  Although that document did not become operative as it was superseded by the Court's Order on ELAP's motion to dismiss, the present pleading is styled as the Second Amended Complaint to avoid confusion with the previously filed amended pleading.

## PARTIES

1.      Intermountain is a non-profit corporation organized and existing under the laws of Utah, with its corporate domicile and principal place of business in Utah.

2.      Intermountain operates 22 hospitals and 185 clinics located in Utah and Idaho.

3.      Intermountain's mission is simple and succinct: helping people live the healthiest lives possible.

4.      ELAP is a limited-liability company organized and existing under the laws of Pennsylvania, with its principle place of business in Chesterbrook, Pennsylvania.

5.       ELAP's business model encourages employers in Utah and other states to adopt ELAP's form of a self-funded welfare benefit plan (a "Plan" or collectively "the Plans") under which members are told they can visit any healthcare provider they choose and that they are only responsible for paying what ELAP says they should pay, rather than what the provider actually charges for those healthcare services.

6.      On information and belief, no member of ELAP is a citizen of Utah.

## JURISDICTION AND VENUE

7.      The court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity in the parties and the amount in dispute is over $75,000 exclusive of interest and costs.

8.      ELAP's intentional actions form a basis for personal jurisdiction.  For example, ELAP makes misleading statements to induce Utah employers to adopt a form of employment-benefit plan that uses ELAP's improper business model.  To induce employers to use ELAP, ELAP makes misleading statements, including the false statement that providers like

Intermountain will, or almost always will, accept whatever ELAP determines should be paid for healthcare services, rather than what Intermountain actually charges.  ELAP encourages Plans and their members to obtain care at Intermountain facilities with the premeditated fraudulent intent of leaving Intermountain's billed charges unpaid as required under Intermountain's contracts with patients.

9.      Accordingly, ELAP wrongfully interferes with potential economic relations between Intermountain and the employers, the Plans, and the Plans' members (Intermountain's patients).

10.     The members of these Plans have sought, now seek, and will continue to seek healthcare services and incur healthcare costs within Utah, including at Intermountain facilities.

11.     ELAP intentionally and purposefully directs its conduct to occur within Utah, knowing that the injury resulting from its actions will be felt in Utah.

12.     Venue is proper in this Court under 28 U.S.C. § 1391 because this is the judicial district in which Intermountain is domiciled and resides and it is where a substantial part of the events giving rise to the claim occurred.

## **GENERAL ALLEGATIONS**

### Intermountain's Health Care Operations

13.     In 2016, Intermountain served more than 1.4 million unique patients in its hospitals and clinics.  Of those patients, Intermountain estimates that more than 1.3 million live in Utah.

14.     In 2015, Intermountain admitted over half a million patients to its emergency rooms and approximately 137,000 patients who suffered from acute needs.

Intermountain's Relationships with Patients and Health Insurers

15.    Intermountain regularly enters into contracts with health insurers that allow patients to access in-network care and to receive discounts on medical services under mutually negotiated terms.  Health insurance is typical among Intermountain patients and most of the insurers who direct patients to Intermountain have a negotiated contract with Intermountain.

16.    These relationships between Intermountain and insurers are often called preferred-provider agreements.  Utah law authorizes and encourages these relationships and contracts, including pursuant to Utah Code Ann. § 31A-22-617.

17.    Insurers are not required to enter into these contracts with Intermountain, but do so to better serve the needs of their members in the markets Intermountain serves.  These contractual arrangements allow Intermountain to collect less than its full billed charges.

18.    Patients that are not affiliated with a contracted insurer do not receive the benefit of a preferred-provider agreement.  Rather, the terms of the patient's payment obligations are governed by the contract the patient signs with Intermountain upon admission to an Intermountain facility.  The contract between Intermountain and patients is called the "Patient Agreement."

19.    Some patients (including those with and without insurance) are eligible to receive help through Intermountain's financial assistance program.  Intermountain works hard to ensure patients are well-informed about that program, which is an important feature of Intermountain's charitable mission.  Non-insured patients may also receive discounts for upfront payments or cash payments.  Some patients qualify to finance medical expenses over time.  Some patients are also eligible for Medicare or other government-run payment programs.

ELAP's Scheme to Freeload on the Back of Intermountain, Other Healthcare
Providers, and Patients Who Pay Their Bills

20.    ELAP is not contracted with Intermountain under a preferred-provider agreement

or any other contractual arrangement.  Instead, ELAP markets itself as an innovative way to

reduce healthcare costs for employers by representing that significant discounts can be realized

without a contracted pricing agreement.

21.    ELAP decides for employers the discounts that should be applied to

Intermountain charges without any agreement with Intermountain to do so and promises Plans

and/or enrollees in its plans they will not have to pay anything beyond what ELAP determines to

"allow" as the maximum payment.

22.    Rather than contracting with Intermountain to obtain pricing discounts in

exchange for providing Intermountain with a predictable volume of patients, or seeking to

negotiate pricing in advance of visiting an Intermountain facility, ELAP's solution is simply to

direct Plans and plan members not to pay Intermountain's billed amounts.  In fact, ELAP

markets its business model to potential new plans by asserting that "The only way to pay less for

health care—is to pay less for health care."

23.    The scheme works like this:  ELAP convinces employers that they can

significantly slash health care costs if they sign on to ELAP's "repricing" methodology.  ELAP,

either on its own or with the assistance of others who work at ELAP's direction, including third

party administrators ("TPAs"), advises employers that they should abandon traditional insurance

or traditional self-funded welfare benefit plans and should instead adopt ELAP's form of self-

funded Plans.  These plans may be aligned with a TPA that can provide access to ELAP's

"repricing" services.  Unlike traditional insurance policies that shift risk to an insurance

company, the employer's self-funded plan collects contributions directly from employees, and

uses that resource pool to pay health care expenses directly as costs of the Plan.  On information

and belief, ELAP benefits from this arrangement through the collection of fees and/or other

compensation received from Plans in exchange for providing these "services."

24.     When a Plan is affiliated with ELAP, it advises the Plan and Plan members that

they can seek medical care from any provider they like, regardless of whether the provider has a

contract with the Plan, and without regard to the provider's charges for those services.  These

representations are misleading and include half-truths, including that ELAP fails to disclose that

obtaining health care services under this scheme requires, as in the case of Intermountain's

Patient Agreement, that the patient agree to pay the health care facility for all of its billed charges

as a condition to receiving services and that, as a result, the patient is legally responsible for

billed charges due to the absence of a preferred-provider agreement.

25.     After a member receives medical care (including resource-intensive, life-saving

medical care), the Plan or its members are required to send their medical bills to ELAP

(including through TPAs) for processing.  ELAP, however, does not pay the amounts a provider

like Intermountain charges as would a traditional insurer.  Instead, ELAP unilaterally decides the

amount ELAP thinks the provider should have charged, and it directs the Plan to send that

amount to Intermountain as payment.  In exercising this role, ELAP calls itself the Plan's

"Designated Decision Maker" ("DDM").  The pricing methodologies ELAP employs are

sometimes called "reference based pricing" or "metric-based pricing."

26.     It is exceedingly rare that the amount ELAP directs a Plan to pay is equal to

Intermountain's billed charges.  ELAP justifies its insufficient reimbursements by correlating its

payments to the amounts the government requires providers to accept under Medicare.  This is true even though ELAP is **not** a federal program, and it has no basis to insist that Intermountain accept publicly-funded pricing for private care.  ELAP also cannot (and does not) provide any of the benefits to Intermountain that incentivize healthcare providers to accept Medicare payments.  Such benefits include, but are not limited to, a consistent and long-term flow of patient volumes that are backed by the assurance of payment built into federal entitlement programs.  ELAP has nothing to do with Medicare, but it misleadingly references Medicare as a convenient excuse for justifying Plan reimbursements that are far less than what Intermountain charges.

27.     Another critical feature of ELAP's scheme is that it tries to insulate Plan members from paying the balance owing to Intermountain after applying ELAP's payment to the patient's billed charges (the "balance bill").  ELAP falsely tells Plans and Plan members that it does not matter where patients receive care or how much the care costs because ELAP will step in to "defend" them against any attempt by the provider to collect the balance bill.  ELAP's statements are misleading and include half-truths.  For example, ELAP fails to disclose that even if ELAP pays for a defense it is the patient that has signed the Patient Agreement and remains personally and legally responsible for billed charges.  This means, among other things, that those patients with unpaid balances may be subject to collection activity and negative credit reporting.  ELAP also pursues litigation against providers in an effort to wrongfully deter providers from such collections.  However, ELAP fails to disclose to patients that it files those lawsuits in the name of the patient and that the patient will be personally subject to the exhausting demands of litigation, including attending depositions, responding to written discovery, appearing in court

for hearings, and that judgment may be entered personally against the patient if a court finds the patient is required to satisfy the outstanding payment amounts.

28.     ELAP's business model is built around the expectation that providers will simply "give in" and accept the insufficient payments ELAP directs Plans to remit.

29.     ELAP markets its business scheme to employers with the claim that an ELAP self-funded Plan is the "perfect vehicle" to control health care costs and falsely claims its repricing methodology is "100% defensible."

### ELAP Knowingly Encourages Patients to Enter Contracts with Intermountain to Obtain Health Care Without Any Intention to Pay for that Care.

30.     To further its misleading scheme, ELAP purposefully, willfully, intentionally and knowingly encourages Plan members—either directly or indirectly— to obtain services and enter into Patient Agreements with Intermountain, knowing that patients will not pay, as agreed, for the services rendered.

31.     Patient Agreements, executed upon admission to an Intermountain facility, obligate patients to pay the amounts billed for the health care services that are thereafter in fact provided at Intermountain's facilities.  In advising Plan members that they can obtain care wherever they like regardless of cost, ELAP necessarily encourages Plan members to sign the Patient Agreement as a condition of receiving health care services.  ELAP does so knowing that Intermountain relies on Patient Agreements to provide contractual assurance of payment for services thereafter in fact provided.

32.     ELAP has specifically targeted and solicited its services to attract Plans with members it knows to be Intermountain patients.  ELAP knows that the terms of Intermountain's Patient Agreements require the patient to pay the amounts Intermountain determines to be owed

for the health care services actually provided.  Nevertheless, ELAP knowingly encourages Plan members to disregard the terms of Patient Agreements signed upon admission by falsely representing and/or implying based upon half-truths that Plan members are not violating the Patient Agreements, including stating that ELAP will step in and defeat balance billing.

33.     ELAP also knowingly and deceptively encourages Plan members to seek and receive care at Intermountain facilities by falsely inducing Intermountain to believe that patients will actually pay for services as agreed.  ELAP encourages Plans and/or Plan members to present proof of Plan coverage or benefits, knowing that Intermountain will rely upon misleading documentation as evidence that the patient is eligible for Plan benefits, while intentionally omitting that ELAP's administration of the Plan is specifically designed to prevent Intermountain from collecting the amounts the patient agreed to pay in the Patient Agreement.  To facilitate this deception, ELAP conceals its role as the so-called DDM at the time patients seek admission to an Intermountain facility.  At all relevant times, ELAP knows both that it will not pay the amounts Intermountain charges for the services and that it intends to interfere with Intermountain's ability to enforce Patient Agreements to collect anything beyond what ELAP decides it should pay.

34.     ELAP also affirmatively tells Plan members that they are not responsible for any health care costs except their co-pay, coinsurance or deductible and ELAP tells Plan members not to pay any money to health care providers upfront other than these amounts, even if a provider requests advance payment.

35.     ELAP knows that once valuable care has been received, the entirety of the benefit of the health care transaction has been bestowed on the Plan member, leaving Intermountain with the burden of trying to collect the amount Plan members agreed to pay, but that ELAP neither

intended to pay itself nor intended to tell a Plan to pay.  In this manner, ELAP fraudulently orchestrates the misappropriation and theft of health care services.

36.     ELAP's representations to Plans, Plan members, and to the market are false, misleading and deceptive.  ELAP and/or its agents have acted with malice when making statements that encourage Plan members to sign Patient Agreements with no intention to abide by their terms.  ELAP and/or its agents know that Intermountain will make available vast amounts of critical health care services to Plan members based on the false representation that Plan members will pay as agreed.  ELAP simply hopes that providers like Intermountain will nonetheless accept the amount ELAP decides to pay, and not the amount Intermountain is owed.

37.     ELAP further misleads Plan members when it communicates with Plan members about their obligation to pay balance bills.  If a Plan member has a question about why it received a balance bill from a provider, ELAP advises that the provider is "seeking reimbursement in excess of what [the Plan] has already paid."  This statement is false.  Providers like Intermountain do not seek "reimbursement" from patients (the way Intermountain seeks "reimbursement" from insurers), but rather providers collect directly from patients the amounts patients have agreed to pay.  ELAP misleadingly suggests that the provider is seeking to recover an "excess" amount, when in fact the provider is seeking to collect the amount the Plan member promised to pay upon admission.

38.     ELAP also advises patients that the amount they "have to pay under [their] plan" is limited to the amount ELAP determines.  This statement is misleading and suggests that patients' financial responsibility to providers is determined by ELAP or the Plan.  The amount a patient is obligated to pay, however, is based on the contract between the provider and the

patient, not the agreement between ELAP and/or its affiliated Plans.  A provider like

Intermountain is under no compulsory legal obligation to accept the ELAP-determined payment

amount as payment in full.  ELAP misleads Plans and their members into believing that patient

financial responsibility is governed by Plan terms to which Intermountain is not a party and not

the terms of the contract the Plan member signs with the provider.  ELAP tells Plan members

they are never going to be responsible to pay the balance between Intermountain's charges and

the amount ELAP determines should be paid.

39.      ELAP engages in these practices knowingly and deceptively.  On information and

belief, ELAP intentionally keeps from Intermountain information that if provided at the time of

admission would alert Intermountain to ELAP's involvement as the so-called DDM.  ELAP

knows that withholding such information prevents Intermountain from making a rational

decision concerning whether to provide non-emergent services to ELAP-affiliated patients

admitted into Intermountain's facilities and/or whether to seek advance payment before

providing care.  ELAP proactively hides its involvement as the alleged DDM, knowing that if

providers like Intermountain are able to detect ELAP's involvement, Intermountain will not

consent to admit Plan members as patients for non-emergent services because ELAP's business

model is designed to avoid paying for services as agreed.

40.      Although ELAP-affiliated Plan members are difficult to identify because ELAP

intentionally tries to shield its involvement, Intermountain estimates that it has treated hundreds

of ELAP-affiliated Plan members who have accrued millions of dollars in unpaid charges as a

result of ELAP's scheme and interference with Intermountain's collection efforts.  To this day,

ELAP is continuing to direct patients to Intermountain based on the business model described

herein.  However, because of ELAP's proactive efforts to shield and conceal its involvement in health care transactions to providers like Intermountain, Intermountain cannot readily identify all such transactions, their date of occurrence, and/or the extent of injury to Intermountain.

41.     Rather than direct plan reimbursements to align with Intermountain's charges, encourage its members to pay their balance bills, discuss pricing and/or discounts with Intermountain in advance of providing care, or otherwise pay Intermountain the amounts owed, ELAP sues Intermountain and/or engages lawyers to fight against the obligations of its Plan members, using its Plan members as pawns.

42.      For example, ELAP is responsible for the filing against Intermountain of the case *Musick et al. v. Intermountain Health Care, Inc.*, No. 2:15-cv-00450 (D. Utah 2015) in which ELAP-directed lawyers filed suit to stop the collection of tens of thousands of dollars in medical bills accrued by ELAP-affiliated patients.  Certain documents filed in connection with that lawsuit are attached as Exhibit A to this Complaint.  Furthermore, ELAP is responsible for sending myriad letters to Intermountain on behalf of other ELAP-affiliated patients through ELAP-retained lawyers to dispute Intermountain's efforts to collect balance bills and/or threatening legal action if Intermountain continues to seek to collect such balance bills.  Through such efforts, ELAP frustrates Intermountain's ability to collect from its patients amounts those patients agreed to pay.

43.     It is upon this misleading business model that "miracles are being created today" according to one company that administers ELAP plans.

## FIRST CLAIM FOR RELIEF

(Intentional Interference with Existing and Potential Economic Relations)

44.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

45.     Defendant intentionally interfered with Intermountain's existing and potential economic relations by improper means, causing injury to Intermountain.

46.     Intermountain has existing and potential economic relations with ELAP-affiliated Plan members that make up a portion of the patient population Intermountain treats.

47.     Intermountain is the largest integrated health network in Utah.  Intermountain reasonably believes and expects that if Plan members are not affiliated with ELAP, they will be affiliated with another private insurer with whom Intermountain has a preferred provider contract or the patient and/or plan will pay as agreed.  Intermountain believes that many current patients now affiliated with ELAP plans were previously insured under health plans that contract with Intermountain.  Intermountain facilities are located in close proximity to major population centers in Utah and Intermountain reasonably expects it would treat such individuals as patients if they are not affiliated with ELAP.  Intermountain estimates that it treated approximately 45% of Utah's 3.1 million residents at its hospitals and/or clinics in 2016 alone.

48.     On information and belief, ELAP has induced employers to leave private insurance plans that have contracts with Intermountain, and instead affiliate with ELAP, either directly and/or through its agents.  ELAP has induced employers to do so with the false promise that their employees can go to any provider (including Intermountain providers), regardless of whether there exists a preferred-provider contract with Intermountain, and that Intermountain will accept the ELAP-determined amount as payment in full.

49.     ELAP has interfered with Intermountain's existing and potential economic relations with patients by misleading patients and encouraging them to obtain care from Intermountain facilities without the intent to pay for such care as Patient Agreements require. Instead, ELAP fraudulently promotes the creation of a relationship between Intermountain and the Plan member in which the Plan member agrees to Patient Agreements in order to induce Intermountain to provide services for which ELAP never intends to pay and for which ELAP intends to prevent Intermountain from seeking payment from the patient in accordance with the Patient Agreement's terms.

50.     By hiding that ELAP assumes the role as "Designated Decision Maker" of the Plans, ELAP and/or its agents engage in deceptive conduct intended to shield from discovery the fact that Intermountain is being induced to provide medical services for which ELAP never intends to pay.

51.     If Intermountain seeks the remainder of the balance due under the Patient Agreements from Plan members, ELAP also institutes and funds litigation against Intermountain for the purpose of interfering with Intermountain's Patient Agreements, which ELAP encourages patients to sign knowing the contract will not be followed.

52.     Defendant's untruthful statements, deceptive actions, and misrepresentations are improper means that interfere with Intermountain's ability to form and/or continue economic relations with Plans and/or Plan members.

53.     Defendant's actions have injured, continue to injure, and will injure Intermountain in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
(Unjust Enrichment)

54.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

55.     Intermountain has rendered valuable health care services to patients that participate in an ELAP-affiliated Plan.

56.     ELAP benefits each time an ELAP-affiliated Plan underpays an Intermountain bill for health care a Plan member received.  On information and belief, ELAP is compensated by a Plan based, in whole or in part, on a percentage fee tied to Intermountain's charges.  On further information and belief, Plan resources from which ELAP is compensated would, in the absence of ELAP's involvement, be applied toward Intermountain's charges.

57.     While ELAP-affiliated Plan members receive the benefit of health care from Intermountain, ELAP receives direct financial benefits from these transactions because it earns more money each time a Plan member visits an Intermountain facility, consumes health care resources, and the Plan pays less than Intermountain's billed charges.

58.     The retention of such benefits in such circumstances (and as described in this Second Amended Complaint) is unjust.

59.     ELAP appreciates and knows, or should know, how much it benefits from each Intermountain bill it decides the Plan will not pay in full.  Re-pricing hospital bills and advising Plans to pay less than Intermountain's billed charges is integral to ELAP's business model and the accrual of the benefits of such transactions is also integral to ELAP's business.

60.     ELAP is collecting money based on the delivery of health care services that ELAP knows were procured based on a promise to pay all of Intermountain's charges.  ELAP

has also obtained these benefits as a result of other misleading acts and similar conduct, as described in this Complaint.

61.     Under these circumstances, it would be unjust for ELAP to retain such benefits without remitting them to Intermountain.

62.     Intermountain has been damaged as a result of ELAP's conduct and the amount of ELAP's unjust enrichment shall be determined at trial.

## THIRD CLAIM FOR RELIEF
(Fraud)

63.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

64.     ELAP has made representations concerning presently existing material facts to employers and/or Plan members, including that affiliating with ELAP-affiliated Plans allow employees and/or Plan members to go to any provider (including Intermountain providers) regardless of whether ELAP has a preferred-provider contract with the provider and that ELAP expects the provider will accept the ELAP-determined amount as payment in full.  ELAP further represents that employees and/or Plan members will not be personally responsible if the provider seeks to collect on a balance bill representing an amount beyond what ELAP determines the Plan should pay.  ELAP represents to ELAP-affiliated Plans and/or Plan members, or otherwise leads them to believe, that to obtain health care services at a facility (including an Intermountain facility), no special arrangements are required and/or that the Plan member can or should sign whatever documents and/or agreements that the facility may present (i.e., the Patient Agreement) as necessary to gain admission to the facility and receive the health care services regardless of

the content of the agreements or the obligations imposed on the Plan member pursuant to such agreements.

65. ELAP's representations include half-truths.  ELAP knowingly encourages Plan members to disregard the terms of Patient Agreements signed upon admission by falsely representing and/or implying that Plan members are not violating the Patient Agreements, including stating that patients are not responsible for anything beyond what ELAP determines they owe and/or that ELAP will step in and defeat balance billing.  In representing that ELAP will step in to defend Plan members, ELAP intentionally does not disclose that patients with unpaid balances may be subject to collection activity and negative credit reporting, and that legal action related to collection activity is undertaken in the name of the patient and the patient is personally subject to litigation demands, including potential entry of judgment.

66. Examples of ELAP's representations include, but are not limited to, the representations set forth in Paragraphs above and in the documents attached as Exhibits B and C hereto.

67. On information and belief, ELAP makes such representations to Plans and/or Plan members through a variety of channels, including both physical and electronic advertising, promotional and marketing materials.  ELAP further makes such representations through direct communications with current and/or prospective Plans and/or Plan members, including through communications transmitted across wires into Utah from other jurisdictions.

68. ELAP knows that its statements are false and/or have been made recklessly, knowing that there was insufficient knowledge upon which to base its representations.  For example, ELAP knows that its unilateral determinations of what a Plan should pay to

Intermountain do not have the force of law.  ELAP further knows that absent a preferred-provider contract, Intermountain is not obligated to accept what ELAP determines the Plan should pay as payment in full.

69.     ELAP also knows that even if ELAP pays for defense costs, it is the individual Plan member, not ELAP, that is the party subject to any action brought to prosecute or defend the collection of balance billing by a health care provider and it is the Plan member who is subject to the consequences of such actions.

70.     ELAP knows, notwithstanding its efforts to provide a defense against balance billing collection, that balance billing is not unlawful and Intermountain is not forbidden by law from pursuing collection activity directly against the Plan member.

71.     ELAP's representations are also false because ELAP knows that facilities like Intermountain routinely require patients to execute admission agreements, such as the Patient Agreement, that obligate patients to pay for all health care services rendered and to otherwise represent to the facility that they will satisfy the billed charges.

72.     Therefore, ELAP knows that when members of an ELAP-affiliated Plan seek admission to an Intermountain facility, they are required personally to represent that they will pay for all health care services rendered.  ELAP knows such a representation is false but encourages Plan members to make this representation to Intermountain as the essential step necessary to enable the patient to receive health care services and thus initiate the transactions between ELAP, the Plan, and/or the Plan Member pursuant to which ELAP is paid.  ELAP knows the facility's billed charges will not be paid as agreed but leads Plans and/or Plan members to believe that they can receive services notwithstanding the Patient Agreement

obligations, or at minimum in a manner not inconsistent with the promises made in the Patient Agreement.

73.     ELAP intends its false representations to Plans and/or Plan members to induce Plan members to seek health care and to represent that they have the backing of an employer Plan and/or insurance that will satisfy the health care provider's billed charges, and to receive health care based on those false representations.  ELAP intends this to result in the execution of Patient Agreements and other representations to Intermountain that ELAP knows will never be kept.  The false promises made in the Patient Agreement are the direct result of ELAP's conduct and are made at ELAP's direction.

74.     ELAP's false statements result in Plan members being deployed as instrumentalities in a fraudulent scheme calculated to induce Intermountain to provide valuable health care services.  ELAP knows that Intermountain has relied, does rely, and will rely on the Plan-Member's promise in the Patient Agreement and otherwise to pay for such services and that Intermountain would not provide such services in the absence of an agreement to pay for them. On information and belief, the less the health care provider is paid, the more money ELAP receives from the Plan.

75.     Furthermore, ELAP makes concerted and active efforts to conceal its role as "Designated Decision Maker" of the Plans.  ELAP and/or its agents engage in deceptive conduct intended to hide the fact that Intermountain is being induced to provide medical services for which ELAP never intends to pay.  ELAP, whether directly or indirectly, promotes or encourages its Plans and Plan-members to display "member cards" upon seeking facility admission, which resemble traditional insurance cards, but intentionally omit any connection to

ELAP.  Such cards are intended to give the false appearance of third-party financial responsibility to pay for health care services.  ELAP knows such appearances are false but are intended to induce providers like Intermountain to provide services.  ELAP intentionally fails to tell Plan members to inform Intermountain that they are participants in an ELAP-affiliated Plan specifically to avoid the Plan members being turned away from Intermountain facilities. Intermountain nevertheless relies on such representations and omissions when it admits ELAP-affiliated patients that have presented a Plan "member card" at the time of admission to its facilities.

76.     In reliance on ELAP's false statements, Plan members seek health care at Intermountain and other facilities with the false expectation and belief that they can go to any health care facility and they will only be liable for the amount ELAP unilaterally decides to pay and/or that ELAP has the right to prevent the facility from collecting its billed charges.  Based on this false belief, they repeat and make false representations to health care providers like Intermountain and Intermountain relies on such representations when it admits ELAP-affiliated patients to its facilities.

77.     For example, Plan members represent in the Patient Agreement that they will pay, among other expenses:

     a.    "any and all of the amounts the Facility or independent contractor determines to be owed for health care services rendered to me at the Facility;"

     b.   "all applicable co-payments, deductibles and co-insurance;" and

     c.   "all charges for non-covered services."

78.     While Intermountain relies on such representations when it admits ELAP-affiliated patients to its facilities that have signed the Patient Agreement, the representations are false.  In fact, the Plan members are led to believe, based on ELAP's false statements, that Intermountain's billed charges will be satisfied based solely on what ELAP decides to pay, and thus Plan members do not intend to fulfill the obligations represented in the Patient Agreement.

79.     Plan members also represent to Intermountain, through presenting a Plan membership and/or insurance-type card that does not disclose ELAP's involvement that they have valid financial benefits that, when combined with the patients' own obligations, will cover the billed charges.  This is an additional false representation, as ELAP intends to cause the Plan to pay a lower amount that ELAP determines and to resist Intermountain's efforts to collect the balance of its billed charges.  Nevertheless, Intermountain relies on such representations when it admits ELAP-affiliated patients to its facilities without knowing about their ELAP-affiliation.

80.     Intermountain relies on the representations of Plan members, made at ELAP's behest, when it admits Plan members to Intermountain facilities and provides health care services with the expectation that Intermountain will receive full payment for its billed charges.  ELAP intends that Intermountain rely on such representations.

81.     That reliance is to Intermountain's detriment because the Plan members, based on ELAP's misrepresentations, are led to believe they should have no reason or intention to pay Intermountain's charges and expect that ELAP will "defend" against efforts to collect beyond what ELAP determines should be paid to the facility.  Therefore, Intermountain does not receive full payment and it is forced to incur additional costs to seek collection of the amounts ELAP does not direct a Plan to pay.

82.     The reliance is also detrimental to Intermountain because it is forced into an antagonistic relationship with its patients that would not exist absent ELAP's false statements. This results in damages, including reputational harm, the loss of balances that go unpaid, attorney fees and collection costs, and other costs and expenses associated with unpaid health care bills.

83.     Intermountain's detriment is not lessened by the fact that it has a contractual right to seek payment of balances from Plan members because ELAP wrongfully interferes with those efforts, resulting in unnecessary costs and expenses.  ELAP's interference with the enforcement of those contractual rights represents a key aspect of its business model.  The right to seek to collect the balance from the Plan member also does nothing to lessen the reputational harm to Intermountain and the animosity that ELAP's conduct causes in Plan members toward Intermountain.

84.     Intermountain has reasonably relied on statements and/or omissions made by ELAP-affiliated patients at the behest of ELAP on numerous occasions.  Because information concerning the ELAP-affiliated patients that have visited an Intermountain facility and received services constitutes information within ELAP's custody or control, and because ELAP actively seeks to conceal its relationship with the patient such that ELAP's involvement is not disclosed upon admission, it is not possible to identify all such patients at this time.

85.     Intermountain has nevertheless become aware of numerous instances in which ELAP-affiliated patients have sought admission to an Intermountain facility, signed Intermountain's Patient Agreement, and presented a "membership card" that omits any reference to ELAP, but is nevertheless intended to induce the facility and provide services to the patient.

86.     For example, Intermountain reasonably relied on statements and/or omissions made by ELAP-affiliated patients[2] to its detriment in the manner described herein on or about at least the following dates:[3]

| **2016** | **2017** | **2018** |
|----------|----------|----------|
| 05/25/2016 | 01/02/2017 | 01/04/2018 |
| 08/01/2016 | 01/04/2017 | 01/13/2018 |
| 08/27/2016 | 02/22/2017 | 01/18/2018 |
| 11/10/2016 | 05/15/2017 | 03/16/2018 |
| | 06/04/2017 | 03/22/2018 |
| | 06/10/2017 | 03/31/2018 |
| | 06/21/2017 | 04/01/2018 |
| | 08/05/2017 | |
| | 08/21/2017 | |
| | 08/22/2017 | |
| | 09/03/2017 | |
| | 09/05/2017 | |
| | 09/25/2017 | |

87.     On information and belief, these examples represent but a small sample of the instances where Intermountain has admitted patients to its facilities in detrimental reliance on the representations, omissions, and half-truths described herein.

88.     As a result of ELAP's fraudulent representations, Intermountain has been induced to provide millions of dollars of health care services to ELAP-affiliated Plan members. However, because of the nature of ELAP's fraudulent scheme, ELAP has interfered with

---

[2] Each entry in the foregoing table represents an individual patient's admission to an Intermountain facility.  Pursuant to its obligations under HIPAA, Intermountain does not identify the specific patients or any other information directly related to an individual. Intermountain will produce such information under seal as the Court may require, pursuant to HIPAA compliant protective order.
[3] The dates listed in the table reflect admission dates by ELAP-affiliated patients that signed a Patient Agreement upon admission and presented a member card that did not reference ELAP.

Intermountain's ability to collect the amounts Plan members promised to pay upon admission to Intermountain facilities.

89.     Defendant's actions have otherwise injured, continue to injure, and will injure Intermountain in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

90.     Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

91.     ELAP owes Intermountain a special duty of care that arises from its knowledge that Plan Members have sought, are seeking, and will seek to obtain Intermountain's services based on ELAP's representations.

92.     ELAP has held itself out as possessing unique or special expertise with respect to determining what a facility should charge for health care services and what facilities will accept as payment in full for providing those services.  ELAP, on its own behalf or by and through its agents, assists employers in creating self-funded welfare benefit plans that use ELAP's business model and include ELAP acting as the "Dedicated Decision Maker" for the Plan with respect to determining the amounts Plans should pay to facilities like Intermountain that render health care services to Plan Members.

93.     ELAP holds itself out as possessing such unique and special expertise to reassure and encourage patients (Plan Members) in seeking and receiving health care services from facilities like Intermountain without regard to, or concern for, the obligation to pay all of Intermountain's charges as set forth in the Patient Agreement.

94.     ELAP has made representations concerning presently existing material facts which are false, including but not limited to those statements alleged in the preceding claim for relief.

95.     ELAP has made false statements negligently.  ELAP knows or should know that its representations promote, induce and/or encourage individuals to seek and obtain medical care, including at Intermountain facilities.  ELAP knows or should know that the essential prerequisite to receiving such care is that the individual will enter into an agreement (i.e., the Patient Agreement) with the facility (i.e., Intermountain) under which the individual promises to pay Intermountain's charges for the health care services rendered.  ELAP knows or should know that neither ELAP, the Plan, nor the Plan member will pay for Intermountain's charges.  ELAP further knows or should know that Intermountain likely would not accept non-emergent ELAP-affiliated Plan-members into the facility if a patient disclosed to Intermountain that the Plan-member is associated with an ELAP-affiliated Plan.

96.     ELAP has made false statements for the purpose of inducing Intermountain to act, including in the manner described in the preceding claim for relief.  ELAP's representations (including those detailed in the preceding claim) are intended to create (at ELAP's behest) a relationship of trust and confidence between the patient and Intermountain based on the Plan member's promise to pay Intermountain's charges.  As such, ELAP induces Intermountain to provide health care services to Plan Members knowing that Intermountain will rely on the Plan Member's promise to pay as agreed, while in fact neither ELAP, the Plan nor the Plan Member intend to honor that promise.

97.     ELAP has a pecuniary interest in inducing Intermountain to act as described herein because ELAP's business model depends on patients being treated at health care facilities like Intermountain and ELAP makes money when it acts as the alleged "Dedicated Decision Maker" and directs Plans to pay facilities less than their actual charges.  ELAP's business model depends on Plan Members seeking and receiving health care services from facilities like Intermountain and, on information and belief, ELAP is compensated, in whole or in part, based on the difference between the facility's billed charges and what ELAP determines the Plan should pay.

98.     ELAP is in a superior position to know the relevant material facts concerning the false representations, omissions and half-truths described in the preceding claim and has, at minimum, carelessly or negligently directed that such misrepresentations be made toward Intermountain in the manner described in the preceding claim.

99.     Particularly because ELAP makes concerted and active efforts to conceal its role as "Designated Decision Maker" of the Plans, Intermountain has acted reasonably in ignorance of the falsity of ELAP's statements, and/or statements made at ELAP's direction.  ELAP and/or its agents engage in deceptive conduct intended to shield from discovery the fact that Intermountain is being induced to provide medical services for which ELAP never intends to pay.  ELAP negligently encourages the use of member cards that omit any connection between the Plan and ELAP and which ELAP knows or should know are likely to result in leading Intermountain to believe that the Plan-member is backed by a third-party payor who will assume some or all the responsibility to pay for the Plan member's health care as required under the Patient Agreement.

100.    As a result of ELAP's fraudulent representations, Intermountain has been induced to provide millions of dollars-worth of health care services to ELAP-affiliated Plan members. However, because of the nature of ELAP's fraudulent scheme, ELAP has interfered with Intermountain's ability to collect the amounts Plan members promised to pay upon admission to Intermountain facilities.

101.    As set forth in the preceding claim for relief, Intermountain has justifiably relied on fraudulent representations communicated through Plan-members at ELAP's behest and for ELAP's benefit.

102.    Defendant's actions have otherwise injured, continue to injure, and will injure Intermountain in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
(Declaratory judgment)

103.    Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

104.    Intermountain is entitled to a Declaratory Judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201.

105.    An actual controversy exists relating to the parties' respective legal rights and duties, and the Court may declare the rights and other legal relations of the parties.

106.    Intermountain requests the Court adjudicate and declare Intermountain's rights and ELAP's duties under the law.

107.    The declaratory relief should affirm that ELAP is required to notify Intermountain in advance before an ELAP-affiliated Plan Member seeks admission to an Intermountain facility

for non-emergent health care services whenever ELAP reasonably expects to have a role in determining the amount to be paid to Intermountain.

108.    The declaratory relief should further state that ELAP is prohibited from taking any action or engaging in any representations suggesting that: 1) Plan members can visit Intermountain without abiding by Patient Agreements; 2) that Intermountain will or must accept whatever ELAP decides to pay for Intermountain's services; and/or 3) that the patients who sign Patient Agreements will nevertheless have no financial responsibility to Intermountain beyond what ELAP determines the patients' financial obligation to be.

109.    The declaratory relief should further state that nothing ELAP does, has done, or may do, in its role as alleged "Dedicated Decision Maker" is legally binding on Intermountain with respect to the amounts Intermountain is obligated to accept as payment in full for health care services rendered to Plan Members except insofar as ELAP directs a Plan to pay all of Intermountain's actual charges.

110.    Declaratory relief is appropriate in addition to the relief requested in connection with Intermountain's other claims because such other relief is principally directed at remedying ELAP's prior misconduct, and not ELAP's anticipated future conduct.  Because of the high likelihood that the conduct described in this Complaint is likely to recur, it is necessary to identify the conduct that is forbidden to ELAP, clarify the nature of the parties' relationship and obligations, and minimize the likelihood that ELAP will be able to continue to conceal its affiliation with Plan Members to Intermountain's detriment.  The Declaratory Relief sought herein will provide Intermountain a fair opportunity to determine whether to allow non-emergent ELAP-affiliated patients admission to Intermountain facilities.

## SIXTH CLAIM FOR RELIEF
(Preliminary and Permanent Injunction)

111.    Intermountain incorporates by this reference all other allegations made in the above and below paragraphs as if fully set forth here.

112.    Intermountain is entitled to a preliminary and permanent injunction that prohibits ELAP and/or its agents from communicating to Utah employers, Plans, or Plan members—either directly or indirectly—that they can visit Intermountain facilities without abiding by Patient Agreements, that they will not be personally responsible for the obligations under their Patient Agreements, and/or that Intermountain will or must accept whatever ELAP decides to pay for Intermountain's services.

113.    Intermountain is further entitled to a preliminary and permanent injunction that when ELAP has a role in determining the amount to be paid to Intermountain either ELAP, the Plan and/or Plan member must disclose that information to Intermountain before a member obtains healthcare services.

114.    Intermountain will suffer irreparable harm if the preliminary injunction does not issue because Intermountain will continue to be duped into providing valuable and scarce health care resources to patients who have been led by ELAP to believe they have no obligation to pay for those services.  This work is made more challenging because ELAP obscures its involvement and administering ELAP plans and Intermountain cannot detect which patients have no intention to pay for the services they receive.  Intermountain faces a significant, but not easily quantifiable, administrative and operational burden in managing these cases and pursuing collections from ELAP-affiliated plan members for whom ELAP funds a legal defense even though the patient, not ELAP, is the party to the Patient Agreement with Intermountain.  Intermountain is incurring

ongoing costs for patients that ELAP has encouraged to visit Intermountain's facilities with no intention of paying as agreed, and Intermountain incurs significant costs in defending and prosecuting actions in which Intermountain seeks to collect amounts that Plan members agreed to pay in Patient Agreements, but where no such intention to pay ever existed.

115.    Intermountain also suffers irreparable harm because Intermountain undergoes additional costs trying to recover full payment, and ELAP purposely frustrates those collection efforts.

116.    The threatened injury to Intermountain outweighs any potential harm to ELAP.

117.    An injunction will stop false and deceiving statements and half-truths and allow Intermountain to have full and transparent information when deciding whether to admit patients.

118.    An injunction will benefit the public interest by preventing ELAP and/or its agents from facilitating entry into contracts ELAP has no intention to perform.  The injunction will also benefit the public interest because it will ensure that scarce and valuable health care resources are not allocated to patients who promise they will pay Intermountain's charges when in reality no such intent to pay actually exists.

119.    Furthermore, Intermountain is likely to succeed on the merits of the case for the reasons set forth herein.

120.    Accordingly, Intermountain seeks the entry of a preliminary and permanent injunction.

## PRAYER FOR RELIEF

Intermountain prays for relief against Defendant as follows:

a.      For judgment in Intermountain's favor on the above causes of action.

b.      For the award of damages in an amount to be proven at trial.

c.      For interest on all amounts awarded as damages, at the applicable pre-judgment rate of interest.

d.      For an order requiring ELAP to restore all benefits it has accrued from underpaying Intermountain's billed charges to Intermountain.

e.      For declaratory relief under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 on the terms set forth herein.

f.      For entry of a preliminary and permanent injunction under Federal Rule of Civil Procedure 65 on the terms set forth herein.

g.      For punitive damages.

h.      For Intermountain's attorneys' fees and costs

i.      For further and additional relief as the Court deems just, proper, or fair.

DATED this 12th day of October, 2018.

**MANNING CURTIS BRADSHAW & BEDNAR PLLC**

*/s/ Chad R. Derum*
Alan C. Bradshaw
Chad R. Derum

*Attorneys for Plaintiff*
*IHC Health Services, Inc. dba*
*Intermountain Health Care, Inc.*

Plaintiff's address:
36 South State Street
Salt Lake City, Utah 84111

## CERTIFICATE OF SERVICE

I hereby certify that I will cause a true and correct copy of the foregoing **SECOND AMENDED COMPLAINT** to be served in the method indicated below to the below-named parties on  October 12, 2018.

___HAND DELIVERY
___U.S. MAIL
___FAX TRANSMISSION
___E-MAIL TRANSMISSION
___CM/ECF

John W. Mackay
Brett L. Tolman
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111

*Attorneys for Defendant*


___HAND DELIVERY
___U.S. MAIL
___FAX TRANSMISSION
___E-MAIL TRANSMISSION
___CM/ECF

Stephen E. W. Hale
Bentley J. Tolk
PARR GBROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT  84111
*Attorneys for Defendant*


___HAND DELIVERY
___U.S. MAIL
___FAX TRANSMISSION
___E-MAIL TRANSMISSION
___CM/ECF

Thomas E. Lavender III
ted.lavender@fisherbroyles.com
Kristopher R. Alderman
kris.alderman@fisherbroyles.com
FISHER BROYLES
945 East Paces Ferry Road, Suite 2000
Atlanta GA 30326

*Attorneys For Defendant*

/s/ Chad R. Derum