MANNING CURTIS BRADSHAW
  & BEDNAR PLLC
Alan C. Bradshaw, #4801
Chad R. Derum, #9452
136 E. South Temple, Suite 1300
Salt Lake City, Utah 84111
(801) 363-5678
abradshaw@mc2b.com
cderum@mc2b.com

*Attorneys for Plaintiff IHC Health Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| IHC HEALTH SERVICES, INC., a non-profit Utah corporation, | **INTERMOUNTAIN'S OPPOSITION TO MOTION FOR PARTIAL DISMISSAL** |
| Plaintiff, | |
| vs. | Civil No. 2:17-cv-01245-JNP-EJF |
| ELAP SERVICES, LLC, a limited-liability company, | Judge Jill N. Parrish |
| Defendant. | Magistrate Judge Evelyn J. Furse |

{01785438.DOCX /}

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

RESPONSE TO ELAP'S FACTUAL ALLEGATIONS .........................................1

ARGUMENT .........................................................................................3

I.    INTERMOUNTAIN'S FRAUD CLAIM IS WELL-PLED. ....................3

    A.    Intermountain has relied on ELAP's misrepresentations......................4

        1.    The Members' false promises in Patient Agreements are directly attributable to ELAP. ...........................................4

        2.    The Members' false promises in Patient Agreements are directly attributable to ELAP under agency law. ...........................6

        3.    ELAP's liability does not require a "direct" representation to Intermountain. .................................................................12

    B.    Intermountain pled fraud with particularity. .......................................14

II.    INTERMOUNTAIN'S NEGLIGENT MISREPRESENTATION CLAIM IS WELL-PLED. .........................................................16

III.    ELAP HAS BEEN UNJUSTLY ENRICHED. ........................................19

    A.    ELAP has received a sufficient benefit. ..............................................20

    B.    ELAP appreciates or knows that Members seek health care from Intermountain. ..................................................................24

IV.    DECLATORY RELIEF IS APPROPRIATE UNDER INTENTIONAL INTERFERENCE AND THE OTHER CLAIMS. ......25

CONCLUSION ...................................................................................27

WORD-COUNT CERTIFICATION .......................................................28

CERTIFICATE OF SERVICE ..............................................................29

Plaintiff IHC Health Services, Inc. ("Intermountain") submits this Opposition to ELAP Services, LLC ("ELAP")'s Partial Motion to Dismiss ("Motion"), ECF No. 35.

## INTRODUCTION

After receiving the Court's prior Memorandum Decision and Order ("Order"), ECF No. 29, Intermountain made substantial revisions to its allegations before filing its Second Amended Complaint, ("SAMC" or "Complaint"), ECF No. 33.  In the SAMC, Intermountain elected to forego the injurious falsehood claim; added the unjust enrichment claim; and addressed the Court's concerns regarding the sufficiency of the allegations establishing the fraud, negligent misrepresentation, and declaratory judgment claims.  Nevertheless, ELAP chose to drag out the pleading stage with a new motion to dismiss that makes arguments that the SAMC plainly resolves.  As shown herein, Intermountain alleges all requisite facts upon which relief may be granted and ELAP's motion should be denied.

## RESPONSE TO ELAP'S FACTUAL ALLEGATIONS

Intermountain's Complaint seeks relief from injuries resulting from ELAP's unlawful business model, which encourages employers to create self-funded welfare benefit plans ("Plans") to provide health care benefits for Plan members

("Members"), with ELAP deciding payment amounts as the Plans' fiduciary. SAMC ¶¶ 8, 22–29, 39. ELAP holds itself out as having a unique expertise in determining what health care providers should charge and tells Plans and Members not to pay anything beyond what ELAP determines should be paid. *Id.* ¶¶ 33, 92. Promising big savings, ELAP tells Members it can seek care from any health care provider and Intermountain will accept that amount. *Id.* ¶¶ 8, 38, 64. Thus, Members routinely seek health care from Intermountain. *Id.* ¶¶ 23–25, 29. While ELAP knows that Members are required to execute Patient Agreements obligating them to pay Intermountain's charges as a condition of admission, ELAP's model disregards provider charges entirely. *Id.* Thus, the Patient Agreements are executed without any intention by ELAP, Plans, or Members to perform as agreed. *Id.* ¶¶ 33, 72–77. Rather, Members seek facility admission based on ELAP's assurances that they can go to "any provider," which are repeated to Intermountain through a false promise to pay. *Id.* ELAP makes money based on how much less Plans pay relative to Intermountain's charges. *Id.* ¶¶ 23, 56.

ELAP's cursory "Factual Allegations" section misstates and oversimplifies Intermountain's Complaint, ignoring the detailed facts pled. ELAP tries to re-cast Intermountain's allegations in a light favorable to ELAP. For example, ELAP says that it "provides . . . cost containment services" to Plans. Motion 6 (citing SAMC

¶ 20).  The relevant portion of paragraph 20 says, "ELAP markets itself as an innovative way to reduce health care costs for employers by representing that significant discounts can be realized without a contracted pricing agreement." SAMC ¶ 20.  Nothing actually says ELAP provides "cost containment services." *Id.*  Similarly, there is nothing in the Complaint saying that ELAP "can help [companies] save money."  *Compare* Motion 6, *with* SAMC ¶¶ 20, 23, 29.

It is unnecessary to correct ELAP's mischaracterizations line-by-line.  The Court must rely on the Complaint and its attached exhibits, not ELAP's marketing spin.  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).  The text of the Complaint controls and all reasonable inferences are to be made in Intermountain's favor.  *Id.*

## ARGUMENT

## I.    INTERMOUNTAIN'S FRAUD CLAIM IS WELL-PLED.

Intermountain's Complaint alleges that ELAP is directly responsible for the false promises that Members make to pay Intermountain's bill without any intent to do so and that Intermountain relies on those promises to its detriment.  SAMC ¶¶ 63–89.  Utah has "long recognized" entering into an agreement "accompanied by the present intention not to perform it" is actionable fraud.  *Cerritos Trucking Co. v. Utah Venture No. 1*, 645 P.2d 608, 611 (Utah 1982).

### A.   Intermountain has relied on ELAP's misrepresentations.

Intermountain's Complaint alleges reliance on multiple fraudulent and misleading statements attributable to ELAP.  *E.g.*, SAMC ¶¶ 64–66, 72–75.  ELAP does not contest that these allegations constitute fraudulent statements.  Instead, ELAP tries to dodge liability by claiming that its fraudulent statements were not *repeated* directly to Intermountain.  Motion 14.  ELAP's narrow construction of Intermountain's fraud claim is inapposite.

### 1.   The Members' false promises in Patient Agreements are directly attributable to ELAP.

A fraudulent misrepresentation claim requires reliance on the defendant's false statement.  *Carlton v. Brown*, 2014 UT 6, ¶ 37, 323 P.3d 571.  However, as this Court recognized, "a false representation does not necessarily have to be made directly to the plaintiff."  Order 15.  A defendant may be "liable if the misrepresentation, 'although not made directly to the other,' is 'made to a third person and the maker intends or has reason to expect that its terms will be repeated *or its substance communicated* to the other, and that it will *influence his conduct*

*in the transaction*.'"  Order 15, n.8 (emphases added) (quoting Restatement

(Second) of Torts § 533 (1977)).[1]

While Intermountain does not allege reliance on the verbatim repetition of

the statements ELAP made to its Members, Intermountain relies on false promises

made in Patient Agreements that precisely *express the effect* ELAP intended its

misrepresentations to have, which is to induce Intermountain to provide health care

to ELAP Members without any intention to pay on Intermountain's terms.  SAMC

¶¶ 64–73.  Thus, ELAP is liable because it knew the "substance" of its false

representations to Plans and Members would be repeated to Intermountain and that

these misrepresentations would "influence" Intermountain's conduct by inducing

Intermountain to admit Members based on promises ELAP knew were false.

Restatement (Second) of Torts § 533; SAMC ¶¶ 64–73.

Among other misrepresentations, ELAP tells Plans and Members they can

go to "any provider;" that providers accept what ELAP determines should be paid

as payment in full; and that Members will not be responsible for anything more.

---

[1] *Ellis v. Hale*, 373 P.2d 382, 385 (Utah 1962) ("If a person fraudulently makes a
misrepresentation . . . to another with the intent that it will be transmitted to a third
person, the latter may have a cause of action against the misrepresentor.");
*Russell/Packard Dev., Inc. v. Carson*, 2003 UT App 316, ¶ 29 n.12, 78 P.3d 616
(citing section 533 in establishing that fraud liability may exist even if the
representation is "not made directly to the other").

SAMC ¶¶ 64–66.  ELAP's statement that Members can go to "any provider" is inseparable from, and cannot be reconciled with, ELAP's knowledge that Intermountain requires patients to execute Patient Agreements that include a promise to pay all Intermountain's charges.  *Id.* ¶¶ 64, 71–72.  Thus, when Members sign Patient Agreements containing a promise to pay Intermountain's charges, Members are communicating to Intermountain the "substance" of ELAP's misrepresentations that they can go to "any provider" and pay only what ELAP determines.  *Id.* ¶ 64.  Indeed, Members' repeated efforts to obtain health care from Intermountain, ***notwithstanding*** ELAP's lack of a preferred-provider agreement with Intermountain, demonstrates that Members renew their communication of ELAP's misrepresentations every time they execute a Patient Agreement.  *Id.* ¶¶ 16–18, 20, 47–48, 64, 68.  Accordingly, as a result of "induc[ing] Plan members to seek health care" based on "false representations," ELAP causes "the execution of Patient Agreements and other representations to Intermountain that ELAP knows will never be kept."  *Id.* ¶ 73.

    2.    <u>The Members' false promises in Patient Agreements are</u>
            <u>directly attributable to ELAP under agency law.</u>

ELAP's liability can also be understood applying agency principles, wherein Plan Members act as agents advancing ELAP's fraud.  *Garland v. Fleischmann*, 831 P.2d 107, 110 (Utah 1992) ("It is well established . . . that a principal is liable

for the acts of his agent within the scope of the agent's authority, irrespective of whether the principal is disclosed or undisclosed.  The fact that an agent acts in his own name without disclosing his principal does not preclude liability on the part of the principal when he is discovered to be such by a third party who has dealt with the agent.").

The elements of an agency relationship include "(1) the principal must manifest its intent that the agent act on its behalf, (2) the agent must consent to so act, and (3) both parties must understand that the agent is subject to the principal's control." *Sutton v. Miles*, 2014 UT App 197, ¶ 10, 333 P.3d 1279.  An agency relationship may arise from the principal's "informal, implicit, and nonspecific" assent and "a person may be an agent although the principal lacks the right to control the full range of the agent's activities . . . ."  Restatement (Third) of Agency § 1.01 cmt. c, d.  Accordingly, "aspects of an overall relationship may constitute agency and entail its legal consequences while other aspects do not."  *Id.* § 1.01 cmt. b.[2]

---

[2] Here, the scope of the agency relationship includes Members making false promises at ELAP's behest because ELAP knows these false promises are essential for Members to receive care and for ELAP to get paid for telling Plans not to pay Intermountain's full bill.

Each element is present here.  First, ELAP manifests its intent that Members act on its behalf in seeking health care deceptively for ELAP's benefit.  Indeed, "[t]he false promises in the Patient Agreement *are the direct result of ELAP's conduct and are made at ELAP's direction*."  SAMC ¶ 73 (emphasis added).  Further, ELAP employs Members as "*instrumentalities in a fraudulent scheme calculated to induce* Intermountain to provide" health care from which ELAP profits.  *Id.* ¶ 74 (emphasis added).  ELAP knows that Members seeking health care from Intermountain must "represent that they will pay for all health care services rendered" and ELAP "encourages [M]embers to make this representation to Intermountain *as the essential step necessary to enable the patient to receive health care services and thus initiate the transactions* . . . *from which ELAP is paid*."  *Id.* ¶ 72 (emphasis added).  Moreover, ELAP encourages the display of deceptive membership cards that omit and conceal any reference to ELAP to "give the false appearance of third-party financial responsibility to pay for health care services."  *Id.* ¶ 75.

Second, the agent's consent to act, is also present.  It is not necessary to show that "the agent manifest assent *to* the principal."  Restatement (Third) of Agency § 1.01, cmts. a, d (emphasis added).  Rather, it is enough that '[i]f the putative agent does the requested act, it is appropriate to infer that the action was

taken as agent for the person who requested the action." *Id.* § 1.01 cmt. c. Here, ELAP tells Members to go to any provider and that they are not responsible for anything beyond what ELAP determines should be paid. SAMC ¶¶ 65, 66. ELAP encourages Members to disregard Patient Agreements (*id.* ¶ 65) and instructs Members "not to pay their bills and to submit any" claims to ELAP. Order 10 (citing ¶ 41, renumbered as SAMC ¶ 37, and Exhibit B to SAMC). The Complaint alleges that Members do all these things. SAMC ¶¶ 40–42, 76–79, 86–89. Thus, while the Members' "consent to act" may not include vocally approving ELAP's fraud, it is sufficient that the Members actually do what ELAP directs to establish that Members act as ELAP's agents.

Third, ELAP and Members "understand that the agent is subject to the principal's control." *Sutton*, 2014 UT App 197, ¶ 10. ELAP acts as the Plans' "Dedicated Decision Maker" in determining what Plans should pay. SAMC ¶¶ 25, 97. Moreover, ELAP's marketing materials establish that ELAP assumes a role as principal in directing the acts of Plans and their Members as agents. To further its unlawful business model, ELAP tells prospective clients:

> A self-funded health plan [designed by ELAP] is the ***perfect agent*** to effect change and seize control of spending. What a ***plan sponsor must do*** is embrace this simple solution, which is to move toward paying for medical goods and services in the same manner that the corporation buys everything else—with

> transparency, with upfront knowledge of the cost.  **ELAP is here to
> lead and assist**.

*Id.* ¶ 66 Ex. C, at 2 (emphases added).  ELAP's marketing emphasizes its role as

principal by underscoring that promised discounts can be obtained **only** by

following ELAP's blueprint.  *Id.* ("ELAP's solution hinges upon the executive

leadership at any given company being willing to see the problem and address it.").

Of course, by "address[ing]" the "problem," what ELAP really means is sending

patients to health care providers with the intent not to pay as agreed.  *Id.* ¶¶ 56, 81,

97.  To wit, ELAP tells employers, "If you are tired of waiting on industry,

government, or erstwhile outside help, then ponder heeding the words of Dr. James

Robinson . . . '**The only way to pay less for health care—is to pay less for health**

**care**.'"  *Id.* ¶¶ 22, 66 Ex. C, at 5 (emphasis added).  Thus, rather than encourage

Plans to negotiate preferred-provider, or discount, agreements or encourage

Members to adhere to their contracts with health care providers, ELAP instructs

Plans and Members to disregard provider charges altogether.  Instead, ELAP exerts

control and substitutes its payment formula as "**the basis of claims coverage and**

**payment by the plan**."  *Id.* ¶ 66 Ex. C, at 6 (emphasis added).  Making this scheme

work requires Members to obtain health care using false promises to pay while

concealing ELAP's involvement.  *Id.* ¶¶ 38–43, 97.

The control ELAP exerts over Members is further evidenced by ELAP's ratification of the false representations *after* Members receive Intermountain's health care.  Restatement (Third) of Agency § 1.01 cmt. c ("[A] person may, through ratification, create the consequences of actual authority with respect to an actor's prior act.").  Among other things, in its role as a Plans' "Dedicated Decision Maker," ELAP asserts plenary control over what payments are made.  SAMC ¶¶ 78, 97.  ELAP does so with the knowledge and expectation that Members will obtain health care without the intention to pay.  *Id.* ¶ 78.  Specifically, after Members receive care, ELAP proceeds to "audit" Intermountain's bills, directs Plans to make deficient payments, advises Members not to pay their bills, defends Members against any effort to collect unpaid bills, and ELAP gets compensated more when Intermountain gets paid less.  *Id.* ¶¶ 76– 79, 97.  Thus, the Members' false promises to pay are, in fact, a manifestation of ELAP's deployment of Members as agents for its own gain.  Indeed, ELAP knows it would have no services to offer—and thus no way to make money—absent Members obtaining health care based on false promises to pay.  The fact that ELAP's post-services conduct is calculated to insulate the Plan and Members from the consequences of making false promises to Intermountain demonstrates

premeditated knowledge and ratification of the agency relationship and the

accompanying fraud.[3]  SAMC ¶¶ 27, 69–70, 97.

 3. <u>ELAP's liability does not require a "direct" representation to Intermountain.</u>

ELAP's fraud liability is analogous to conduct other courts have found to be

within the scope of section 533 of the Restatement (Second) of Torts.  For

example, "one of the situations" to which section 533 applies includes

"misrepresentations to a credit-rating company for the purpose of obtaining credit

from a third party."  *See In re Kukuk*, 225 B.R. 778, 785 (B.A.P. 10th Cir. 1998)

(quoting Restatement (2d) Torts § 533 cmt. f).  "[T]he maker (of the

misrepresentation) is liable to any person who may be expected to and does extend

credit to him in reliance upon the erroneous rating so procured."  Restatement

(Second) of Torts § 533 cmt. f.  Moreover, it is "immaterial" that the rating

company does not communicate the original false representations.  *Id.*  Rather, "it

is enough that their substance is summarized . . . ***or that the rating given expresses***

---

[3] *Cf. Mun. Bldg. Auth. v. Lowder*, 711 P.2d 273, 279 (Utah 1985) (holding that a principal's liability for an agent's acts based on apparent authority is "implied where the principal has permitted the agent to mislead third parties into extending credit to the agent in reliance on the principal's credit *or has otherwise ratified the agent's actions*." (quoting Restatement (Second) of Agency §§ 26, 27 (1958) (emphasis added)).

***the effect of the misstatements made***.”  *Id.* (emphasis added).  This principle has

been applied in several contexts outside credit-rating.[4]

While some factual differences exist between the present case and the credit-

rating scenario, the underlying legal principle applies equally.  Like the defrauded

seller who is misled into extending credit based on misrepresentations to a

credit-rating agency (but not the seller directly), Intermountain is misled into

providing health care “on credit” to Members.  Intermountain does so based on

Members’ false promises to pay, which “express[] the effect” of ELAP’s

misrepresentations.  *Ojibwe Indians*, 2012 WL 5439170, at *7 (citing Restatement

(Second) of Torts § 533 cmt f)  In both the credit-rating cases and the present case,

the maker of the fraudulent representation is liable for the reliance it knowingly

---

[4] *E.g.*, *Hoffman v. Stamper*, 867 A.2d 276, 292 n.12 (Md. 2005) (holding that appraiser who knowingly prepared inflated property appraisals could be liable for fraudulent misrepresentation to purchasers and recognizing that even though the purchasers were not given the appraisals, they relied upon documents assuring them that the properties’ values at least matched the appraisals); *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 2007 WL 4209399, at *8–9 (N.D. Cal. Nov. 26, 2007) (rejecting argument that plaintiffs must have heard certain half-truths “directly” from defendant where plaintiffs relied indirectly on “certifications” issued by the standards-setting agency); *Corp. Comm’n of Mille Lacs Band of Ojibwe Indians v. Money Ctrs. of Am., Inc.,* 2012 WL 5439170, at *7 (D. Minn. Nov. 7, 2012) (holding under section 533 where defendant “would not have received a vendor license but for its misrepresentations,” the license itself “***expresses the effect of the misstatements made***.”).

and intentionally induces, even if the original representations are not made directly to the defrauded party.[5]  Stated simply, the Patient Agreement itself "expresses the effect of the misstatements made" and ELAP is liable for Intermountain's reliance on such misstatements.  *Ojibwe Indians*, 2012 WL 5439170, at *7.[6]

### B.   Intermountain pled fraud with particularity.

When alleging fraud, "a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  In addressing ELAP's prior motion, the

---

[5] For these reasons, ELAP's claim that Intermountain "would not have relied on" ELAP's statements "if they had been made or repeated to IHC" lacks merit.  *See* Motion 15.  While Intermountain does not allege reliance on the verbatim repetition of ELAP's statements to its Members, Intermountain has relied on Members' representations that precisely *express the effect* ELAP intended its own misrepresentations to have.  SAMC ¶¶ 64–73.

[6] In addition, Intermountain previously (in its opposition to ELAP's first motion to dismiss) identified authorities establishing that fraud liability does not depend on an injured party receiving the verbatim repetition of the original fraudulent representation.  Opp'n Mem. 16–18, ECF No. 11 (citing *Comm. on Children's Telev'n, Inc. v. Gen. Foods Corp.*, 673 P.2d 660, 674 (Cal. 1983) (holding that "[r]epetition" is not a "prerequisite to liability" and that "it should be sufficient that defendant makes a misrepresentation to one group intending to influence the behavior of the ultimate purchaser, and that he succeeds in this plan."); *Learjet Corp. v. Spenlinhauer*, 901 F.2d 198 (1st Cir. 1990) (holding seller of aircraft liable for purchaser's reliance on seller's falsely-procured FAA certification, even though seller's misrepresentations were made to the FAA and not the purchaser)).  Because the Court's prior Order did not directly address these and similar persuasive authorities (*see* Opp'n Mem. 16 n.2), which concern whether direct misstatements are necessary, Intermountain again references them here.

Court observed that a "relaxed standard" may apply where, as here, the "essential information about the misrepresentations is in the defendant's exclusive possession" and ELAP intentionally seeks to obscure the identities of Members. Order 17; Opp'n Mem. 3–4.  Nevertheless, the Court concluded Intermountain still must allege "at least some specifics of the fraudulent misrepresentations" to satisfy Rule 9(b).  Order 17.

The Complaint's additional allegations cure any prior deficiency.  SAMC ¶¶ 64–89.  Nevertheless, ELAP claims Intermountain never pled the "time, place, or [the person's] identity" relating to ELAP's false statements.  Motion 18.  This is false.  Intermountain pled that ELAP made false representations directly to Intermountain through Members and indirectly through Members expressing the effect of ELAP's misrepresentations.  SAMC ¶¶ 64–75.  While the time, place, and manner of ELAP's misrepresentations to Members are not yet identified, Intermountain has alleged twenty-four instances between 2016 and 2018 where Members executed Patient Agreements containing false promises that ELAP induced.  *Id.* ¶ 86 n.2.[7]  Thus, with respect to these misrepresentations,

---

[7] Intermountain refrains from identifying patient names and other protected health information, yet Intermountain offered more under a HIPAA-compliant protective order.  *Id.* ¶ 86 n.2.  Also, ELAP could easily identify the Members' identities based on its own records.

Intermountain has alleged the time (at least 2016–2018), place (Intermountain facilities), and identity of those making the false statements (ELAP, including through Members).

ELAP claims Intermountain has not identified the "content of the fraudulent statements," which Members made at ELAP's behest.  This is also untrue.  The Complaint identifies specific terms in the Patient Agreements where Members "represent . . . they will pay," including "any and all amounts the Facility . . . determines to be owed for health care . . . ."  *Id.* ¶ 77.  Additionally, the Complaint identifies the fraudulent statements such as the presentation of membership cards that give the appearance of third-party financial responsibility and conceals ELAP's involvement and the lack of intention to pay.  *Id.* ¶¶ 75, 78.

## II.   INTERMOUNTAIN'S NEGLIGENT MISREPRESENTATION CLAIM IS WELL-PLED.

A negligent misrepresentation claim allows "a party injured by reasonable reliance upon a second party's careless or negligent misrepresentation of a material fact" to recover damages when: (1) the second party had a pecuniary interest in the transaction; (2) was in a superior position to know the material facts; and (3) should have reasonably foreseen that the injured party was likely to rely upon the fact.  *Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986).

Recognizing the Complaint's sufficiency, ELAP does not challenge the foregoing elements.  Instead, ELAP asserts that the negligent misrepresentation claim fails for the same reasons as the fraud claim, i.e., Intermountain did not plead with particularity or rely on ELAP's misrepresentations.  Motion 20.  ELAP's recycled argument offers no new contentions specific to the negligent misrepresentation claim.  Accordingly, the discussion above concerning ELAP's actionable misrepresentations, and Intermountain's reliance thereon (which are alleged with particularity), apply equally to negligent misrepresentation.[8]  SAMC ¶¶ 90, 94–95, 101.

ELAP also claims Intermountain failed to allege a "special duty" running from ELAP to Intermountain.  Motion 19, 21 (citing *Ellis*, 373 P.2d at 384–85).  Assuming a "special duty" is a required element,[9] Intermountain has alleged that

---

[8] Contrary to ELAP's assertion, a plaintiff need not prove all the elements of fraud to establish negligent misrepresentation.  *Price–Orem*, 713 P.2d at 59 n.2. ("Although the cause of action for negligent misrepresentation grew out of common law fraud, the elements of fraud need not be independently established."); *Robinson v. Tripco Inv., Inc.*, 2000 UT App 200, ¶ 13, 21 P.3d 219 (same).

[9] While *Ellis* references a "special duty," 373 P.2d at 384–85, there is little elaboration in any case describing what is required, if anything.  A Westlaw search of the headnote in *Ellis* referencing a "special duty" yields three results:  (1) *Smith v. Frandsen*, 2004 UT 44, ¶ 9 n.3, 94 P.3d 919 (referencing *Ellis* only for "statutory obligations" and not discussing or mentioning "special duty"); (2) *Hafen v. Strebeck*, 338 F. Supp. 2d 1257, 1265 (D. Utah 2004) (referencing a general

(continued . . .)

ELAP shoulders such a duty, which "arises from its knowledge that" Members

specifically seek Intermountain's health care "based on ELAP's representations."

SAMC ¶ 91.  ELAP also claims Intermountain has not pled that ELAP has "any

sort of special expertise or competence on which IHC relied."  Motion 21.  In fact,

Intermountain pled that ELAP holds itself out as "possessing unique or special

expertise with respect to what a facility should charge for health care services and

what facilities will accept as payment in full for providing those services" and does

so to "reassure and encourage" Members "in seeking and receiving health care"

from "Intermountain without regard to, or concern for, the obligation to pay"

Intermountain "as set forth in the Patient Agreement."  SAMC ¶¶ 92–93.  In other

words, ELAP's business depends on convincing Plans and Members that *it* knows

best what a hospital should charge and that *it* has the unique expertise to determine

what must be paid and what should be ignored.  *Id.* ¶ 66 Ex. C (ELAP

representing, "[W]hat a plan sponsor must do is embrace" ELAP's 'simple'

solution wherein ELAP's payment formula replaces facility charges as "the basis

of . . . payment").  That "special expertise," which convinces Plans and Members

to believe that ELAP can somehow supersede their obligations under the Patient

"duty" requirement and *Ellis* for "statutory obligations"); and (3) this Court's prior
Order, ECF No. 29.

Agreement (*id.* ¶ 72), is manifest to Intermountain every time a Member signs a

Patient Agreement "without regard to, or concern for" the actual payment

obligations. *Id.* ¶¶ 93, 96. [10]

## III.   ELAP HAS BEEN UNJUSTLY ENRICHED.

Utah recognizes unjust enrichment as a viable cause of action to recover a

benefit unjustly received by another. *Emergency Physicians Integrated Care*

["*EPIC*"] *v. Salt Lake Cty.*, 2007 UT 72, ¶ 11, 167 P.3d 1080 (citing cases).  To

prove unjust enrichment, claimants must show: "(1) [T]he defendant received a

benefit; (2) an appreciation or knowledge by the defendant of the benefit; (3) under

circumstances that would make it unjust for the defendant to retain the benefit

---

[10] ELAP further contends no "special duty" exists where the parties deal at arm's length and "the plaintiff could have easily cleared up any confusion with a simple question."  Motion 19 (quoting *Ellis*, 372 P.2d at 385).  However, the law presumes parties execute contracts with an intent to perform as agreed and Intermountain is justified in relying on patients' execution of the Patient Agreement as a representation of their intent to pay without parol questioning. *Cerritos Trucking*, 645 P.2d at 611 ("[O]ne who promises another to do something in the future as a condition or inducement to him to do anything, impliedly asserts a present intent to carry out his promise.").  Nothing requires questioning millions of patients to determine if they are among the small subset of ELAP Plan Members and if they or their Plans *really* intend to pay.  ELAP's intentional concealment of its involvement with its own Members also demonstrates that questioning patients is unlikely to yield useful answers.  SAMC ¶¶ 34, 40, 75, 84, 99 (highlighting ELAP's concealment efforts).  Nevertheless, the Court can make no inference in ELAP's favor on this point, only in Intermountain's.

without paying for it." *Id.* (quoting *Davies v. Olson*, 746 P.2d 264, 269 (Utah Ct. App. 1987)); *U.S. Fid. & Gaur. Co. v. U.S. Sports Specialty*, 2012 UT 3, ¶ 12, 270 P.3d 464.[11]

Notably, ELAP misstates the governing law in characterizing at least the first element of unjust enrichment by stating that a claimant must allege "*it conferred a benefit* on the defendant . . . ." Motion 9 (emphasis added) (citing *U.S. Fid.*, 2012 UT 3). In fact, the issue is not whether the claimant conferred a benefit on the defendant, but instead whether "a benefit [was] conferred on one person ***by another***." *Rawlings v. Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754 (emphasis added). Less significant than *who* conveyed the benefit is whether a benefit was, in fact, received by the defendant. *Id.*

### A.   ELAP has received a sufficient benefit.

The Utah Supreme Court's decision in *EPIC* resolves ELAP's attempt to re-write caselaw to require a direct conferral of a benefit on the defendant. In *EPIC*,

---

[11] The Utah Supreme Court has also recognized that unjust enrichment and restitution are flexible doctrines not susceptible to rigid formulas: "It is . . . a flexible, equitable remedy available whenever the court finds that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to make compensation for benefits received." *Jeffs v. Stubbs*, 9770 P.2d 1234, 1245 (Utah 1998) (quoting *Murdock-Bryant Const., Inc. v. Pearson*, 703 P.2d 1197, 1202 (Ariz. 1985) (in banc)).

the plaintiff was a health care provider who sought to recover payment from Salt Lake County for the care EPIC provided to inmates in the County's detention facility.  2007 UT 72, ¶ 1.  The County argued that "any benefit [the County had received] was merely incidental" and that the inmate rather than the County was the one who received the benefit conferred by the health care provider.  *Id.* ¶ 24. The Utah Supreme Court rejected this argument: "We acknowledge that EPIC provided a physical benefit to the treated inmates, but the County also benefited from EPIC's service."  *Id.* ¶ 27.  The County's benefit was "sufficient to establish the first prong of a quantum meruit [or unjust enrichment] claim."  *Id.*  Thus, *EPIC* demonstrates that health care rendered to a patient can form the basis for an unjust enrichment claim if the care also benefited a third party, i.e., ELAP.

Ignoring *EPIC*, ELAP relies on *Baugh v. Darley*, 184 P.2d 335 (Utah 1947). *Baugh* involved a plaintiff real-estate investor who attempted to purchase and immediately flip land at a profit.  *Id.* at 336.  The court held that there was no unjust enrichment because the plaintiff acted "for his own advantage" or "benefit" when he sought to flip the land and that any benefit the landowner may have received was too incidental.  *Id.* at 336, 337–38.  The court recognized that the "[d]efendant received no benefit.  Had he received a benefit, the law would imply an obligation to pay therefor."  *Id.* at 338.

Here, when Intermountain cares for its patients, it does not do so gratuitously, officiously, or "for [its] own advantage" as if trying to flip property at a profit.  Instead, ELAP interferes with the economic transaction between Intermountain and its patients and receives a portion of the benefit the Plan or Member would have otherwise paid Intermountain.  *Id.* ¶¶ 56–58.  Thus, "ELAP receives direct financial benefits from these transactions . . . ."  *Id.* ¶ 57.  It "benefits each time an ELAP-affiliated Plan underpays," and ELAP "is compensated . . . on a percentage fee tied to Intermountain's charges."  *Id.* ¶ 56.  Also, although the Court need not go any further than the Complaint's allegations, ELAP suggests the benefit it receives is pursuant to a contract between ELAP and ELAP's customers.  Motion 10–11.  This corroborates the allegations that ELAP acts as a principal and receives a direct benefit and the charges ELAP instructs Plans and Members not to pay.[12]

---

[12] ELAP erroneously states that contractual obligations cannot be the basis for an unjust enrichment claim and cites *U.S. Fidelity*.  Motion 11.  *U.S. Fidelity* holds only that when a contract exists between a claimant and defendant, then it precludes the equity-based claim.  2012 UT 3, ¶ 11.  The contract here is between the Plans and ELAP, not Intermountain and ELAP.  Thus, *U.S. Fidelity* is inapposite.  Also, neither *EPIC*, *Baugh*, nor *Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, 12 P.3d 580 (discussed below) conclude that a legal or contractual duty between beneficiaries interferes with a third-party's unjust enrichment claim.

The other case ELAP cites, *Desert Miriah*, similarly supports Intermountain. 2000 UT 83.  Desert Miriah (a plaintiff defending a counterclaim of unjust enrichment) had received a benefit when the party claiming unjust enrichment loaned Desert Miriah's president, as an individual, money that would be used to pay back Desert Miriah's loan.  *Id.* ¶¶ 5, 14.  Desert Miriah argued that its president was the sole beneficiary of the loan, not the entity.  However, the court held that Desert Miriah had also received a sufficient benefit from the transaction to satisfy the first and second elements of the unjust enrichment claim.  *Id.* ¶ 14.  This holding, as in *EPIC*, underscores that ELAP benefits from its scheme of diverting Plan resources from Intermountain to itself.

Here, ELAP entices Members to obtain health care from Intermountain believing that they are entitled to a discount while arming them with membership cards that conceal ELAP's role.  SAMC ¶¶ 20–22, 33, 75, 79, 85, 99.  ELAP does so intentionally, knowing that the Members will sign Patient Agreements.  *Id.* ¶¶ 22–24, 31, 36.  ELAP has no intention of directing the Plans to pay for the billed charges to which the Members agreed.  *Id.* ¶¶ 8, 30, 36.  And ELAP benefits from the entire scheme by collecting a portion of the money the Plans do not pay.  *Id.* ¶¶ 56–60.  The arrangement is unjust and Intermountain is entitled to recover the portion ELAP receives.  *Id.* ¶¶ 58–62.

### B.     ELAP appreciates or knows that Members seek health care from Intermountain.

The second element of unjust enrichment requires the plaintiff to allege "an appreciation or knowledge by the defendant of the benefit." *EPIC*, 2007 UT 72, ¶ 11.  Citing *Desert Miriah*, ELAP contends a defendant must have had this knowledge *at the time* the benefit was provided.  While *Desert Miriah* mentions that the party who received the benefit appreciated and knew of the benefit at the time it was conferred, the court does not hold that the particular timing of the knowledge is necessary or dispositive.  2000 UT 83, ¶ 15.  If timing were relevant, courts would include this temporal limitation in the common three-element test.

Even if there were a requirement that the conferee appreciated and knew of the benefit at the exact moment it was conferred, Intermountain's claim still survives because "ELAP appreciates and knows . . . how much it benefits from each Intermountain bill it decides the Plan will not pay in full."  SAMC ¶ 59. ELAP knows it is not entitled to a contractual discount.  *Id.* ¶¶ 20–23.  ELAP "purposefully, willfully, intentionally and knowingly encourages Plan members— either directly or indirectly—to obtain services and enter into Patient Agreements with Intermountain, knowing that the patients will not pay, as agreed."  *Id.* ¶ 30. ELAP "knowingly and deceptively encourages Plan members to seek and receive care . . . by falsely inducing Intermountain to believe that patients will actually

pay." *Id.* ¶ 33.  Also, as mentioned above, ELAP's Motion announces that it receives a "contractual payment" from the Plans that results from underpaying Intermountain.  Motion 11.  When ELAP receives the benefit from the Plans, ELAP certainly appreciates that its money comes from Intermountain caring for its Plan's Members and ELAP instructing Plans to underpay Intermountain.  SAMC ¶¶ 59–60.

## IV.   DECLATORY RELIEF IS APPROPRIATE UNDER INTENTIONAL INTERFERENCE AND THE OTHER CLAIMS.

The availability of declaratory relief depends on the existence of an independent remediable substantive right.  *Long v. Wells Fargo Bank, N.A.*, 670 F. App'x 670, 671 (10th Cir. 2016).  ELAP argues that if the Court were to dismiss the claims for unjust enrichment, fraud, and negligent misrepresentation, then the declaratory relief should be dismissed as well.  Motion 23.  However, the claim for intentional interference with economic relations has already survived ELAP's prior motion to dismiss, and it alone can provide the predicate foundation for declaratory relief.  ELAP does not argue otherwise in its current Motion.

Intermountain needs declaratory relief to ensure that ELAP stops injuring Intermountain after this lawsuit.  Also, even if other relief were available, that "does not preclude a declaratory judgment that is otherwise appropriate."  Fed R. Civ. P. 57; *see also id.* at R. 18(a)–(b).  Furthermore, nothing in Intermountain's

proposed declaratory relief affects a patient's right to seek admission to Intermountain's hospitals.

ELAP alternatively argues that there is no standing for the declaratory relief, but attacks only the "injury in fact" element as it relates to ELAP's misstatements. Motion 24.  ELAP has not challenged standing as it relates to unjust enrichment. *Id.*

Standing requires showing, *inter alia*, one "has suffered an 'injury in fact' that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). If seeking "prospective relief, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Id.*  "Past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *Id.*

Intermountain is required only to plead plausible facts that show it is suffering a continuing injury related to the fraud and negligent misrepresentation claims.  As discussed above, Intermountain has done so. *See supra* Section I. "To this day, ELAP is continuing to direct patients to Intermountain . . . ."  SAMC ¶ 40. Also, "Defendant's actions have otherwise injured, continue to injure, and will injure Intermountain . . . ." *Id.* ¶¶ 89 (Fraud), 102 (Negligent Misrepresentation).

Intermountain has pled facts and provided documentary evidence of ELAP's past statements including a history of ELAP performing its unlawful scheme resulting in injury to Intermountain.  *Id.* ¶¶ 42, 66, Exs. A, B, C.  ELAP's past actions increase the likelihood of it repeating them in the future.

Furthermore, this Court has held that Intermountain's allegations in its original Complaint established that Intermountain "is sustaining and will continue to sustain injury from ELAP's alleged interference with economic relations." Order 21.  "Indeed, ELAP has given no indication it intends to halt the alleged harmful activity."  *Id.*  While these holdings relate to intentional interference, the foundations of that holding apply equally to the other causes of action.

## CONCLUSION

For the above reasons, the Court should deny ELAP's Motion in its entirety.

RESPECTFULLY SUBMITTED, this 30th day of November 2018.

**MANNING CURTIS BRADSHAW & BEDNAR PLLC**

*/s/ Chad R. Derum*
Alan C. Bradshaw
Chad R. Derum
*Attorneys for Plaintiff IHC Health Services, Inc.*

## <u>WORD-COUNT CERTIFICATION</u>

I certify that I have run a word-count feature on Microsoft Word for this document excluding the face sheet, table of contents, table of authorities, signature block, certificate of service, exhibits, and this certification.  There are 6,270 words in this memorandum in opposition.


*/s/ Chad R. Derum*

_____

## CERTIFICATE OF SERVICE

I hereby certify that I will cause a true and correct copy of the foregoing to be served in the method indicated below to the below-named parties on November 30, 2018.

___HAND DELIVERY
___U.S. MAIL
___FAX TRANSMISSION
___E-MAIL TRANSMISSION
_X_CM/ECF

John W. Mackay
Brett L. Tolman
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111

*Attorneys for Defendant*

___HAND DELIVERY
___U.S. MAIL
___FAX TRANSMISSION
_x_E-MAIL TRANSMISSION
___CM/ECF

Thomas E. Lavender III
ted.lavender@fisherbroyles.com
Kristopher R. Alderman
kris.alderman@fisherbroyles.com
FISHER BROYLES
945 East Paces Ferry Road, Suite 2000
Atlanta GA 30326

*Attorneys for Defendant*

___HAND DELIVERY
___U.S. MAIL
___FAX TRANSMISSION
___E-MAIL TRANSMISSION
_x_CM/ECF

Stephen E.W. Hale
shale@parrbrown.com
Bentley J. Tolk
btolk@parrbrown.com
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT 84111

*Attorneys for Defendant*

*/s/ Chad R. Derum*
_____