MANNING CURTIS BRADSHAW
 & BEDNAR PLLC
Alan C. Bradshaw, #4801
Chad R. Derum, #9452
136 E. South Temple, Suite 1300
Salt Lake City, Utah 84111
(801) 363-5678
abradshaw@mc2b.com
cderum@mc2b.com

*Attorneys for Plaintiff IHC Health Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| IHC HEALTH SERVICES, INC., a non-profit Utah corporation,<br><br>         Plaintiff,<br><br>vs.<br><br>ELAP SERVICES, LLC, a limited-liability company,<br><br>         Defendant. | **INTERMOUNTAIN'S MOTION TO DISMISS COUNTERCLAIMS**<br><br>Civil No. 2:17-cv-01245-JNP-EJF<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff IHC Health Services, Inc. ("Intermountain") submits this Motion to Dismiss ELAP Services, LLC ("ELAP")'s two counterclaims ECF No. 38.

## STATEMENT OF RELIEF SOUGHT AND GROUNDS FOR THE MOTION

Intermountain moves to dismiss ELAP's two counterclaims [ECF No. 38] for failing to state a claim for which relief may be granted and for failure to join necessary parties under Federal Rules of Civil Procedure 12(b)(1), (6), (7) and/or 12(c).   Intermountain moves to dismiss because i) ELAP lacks standing to pursue its counterclaims and the Court thus lacks subject matter jurisdiction; ii) ELAP pleads only remedies but no substantive claims and lacks a cognizable legal interest justifying declaratory or injunctive relief; iii) ELAP cannot assert Members legal interests without joining them as parties or brining a class action; and iv) allowing ELAP to seek the requested relief would require the Court to intervene in setting health care policy and pricing, which should be left to the legislative branches.

## INTRODUCTION

In response to Intermountain's lawsuit, which poses a fundamental threat to ELAP's unlawful business model, ELAP attempts to "push back" with two counterclaims seeking to invalidate the agreement all Intermountain patients execute upon admission to an Intermountain facility ("Admission Agreement," which ELAP calls the "Admission Form").  According to ELAP, because the Admission Agreement does not detail all charges at the time of admission, but instead obligates patients to pay charges that are totaled after care is received, Intermountain obligates patients to pay "excessive," "unreasonable" and "unconscionable" amounts.  ELAP seeks declaratory and injunctive relief to stop Intermountain from seeking to collect its charges from patients.

ELAP's effort to go on the "offensive" is more accurately characterized as a misuse of the Court's time, attention, and resources.  At a most fundamental level, ELAP lacks standing to obtain any of the relief it seeks.  As ELAP concedes, it has no contractual relationship with Intermountain and it is not a party to any Admission Agreement.  Accordingly, the rights ELAP's counterclaims seek to adjudicate are not ELAP's rights, but the rights of Members of ELAP-affiliated Plans who are parties to a contract with Intermountain to which ELAP is a legal stranger.  ELAP tries to concoct an "injury in fact" by claiming that it incurs "defense" costs when Intermountain seeks to collect unpaid balances from Members for health care received at Intermountain facilities.  But such costs are simply the result of ELAP's voluntary choice to enter into contracts with Plans where ELAP agrees to provide such a defense.  Intermountain does nothing requiring ELAP to incur such costs and it has opposed ELAP's "defense" efforts as tortious interference with Intermountain's agreements with patients.  The notion that ELAP can claim as an "injury" providing the "defense" Intermountain has sued to prohibit is farcical.

Furthermore, the "cause" of ELAP's defense commitment is not Intermountain's conduct, but the conduct of Members and/or Plans who refuse to pay Intermountain's charges, leaving Members responsible for the balance.  Critically, the Members and Plans that independently decide what is paid to Intermountain are not parties to this suit and ELAP has no standing to sue Intermountain to remedy an injury traceable to non-parties.  Instead of suing Intermountain, ELAP can avoid defense costs by not entering into contracts that require such defense obligations or, even more simply, by telling Members to pay what they agreed to pay.

In short, ELAP has no legal right to stand in the shoes of Members that have entered into contracts with Intermountain to try and nullify those Members' obligations.  If Members have a

dispute with Intermountain's charges, they have the legal right to pursue relief in their own name, just as ELAP has paid for them to do in other cases before this Court.[1]  What ELAP cannot do is adjudicate in bulk *all* of Intermountain's agreements with patients and *all* of its bills with the unworkable demand that the Court deem to be "excessive," "unreasonable," and "unconscionable" any Intermountain charge beyond what ELAP tells Plans to pay.  The Court lacks any authority to make such an adjudication without joining as parties the patients whose rights and interests would be affected as a result.

Furthermore, because the relief ELAP seeks would invalidate the Admission Agreement and fix ELAP's payment methodology as the universal gold standard for what health care should cost, ELAP's counterclaims invite the Court to wade deeply into the political waters best left to the legislature.  Indeed, while the thrust of ELAP's counterclaim is its alleged concern about the absence of specific price terms in the Admission Agreement before care is provided, the Utah Legislature has already acted to address this concern through legislation that allows consumers to know hospital charges before care is received and to verify those charges after receiving care. Because the legislature has provided a vehicle for patients to ascertain charges before care is received, the Court should refrain from applying the common law principals ELAP relies upon to invalidate all Admission Agreements in bulk.  The Court should resist ELAP's effort to turn this Court into the spokesperson for ELAP's business model and instead defer to legislative bodies questions concerning structural reforms to the health care system.

---

[1] *See* ELAP Answer ("Ans.") ¶ 42 (admitting that ELAP directed lawyers to file the case *Musick et al. v. Intermountain Health Care Inc.,* No. 2:15-cv-00450 (D. Utah 2015).

## ELAP'S FACTUAL ALLEGATIONS

As described below, ELAP has alleged and/or admitted the following relevant allegations in its Answer and Counterclaim.

ELAP offers two "counts" as counterclaims.  First, ELAP seeks a declaration from the Court that the Admission Agreement does not permit Intermountain to collect (1)" excessive amounts," (2) "unreasonable amounts," or (3) "unconscionable amounts."  *See* Counterlaim ("CC") ¶ 36.  Second, ELAP seeks a permanent injunction prohibiting Intermountain from seeking to collect (1) "excessive amounts," (2) "unreasonable amounts," or (3) "unconscionable amounts" from [Members[2]]."  CC ¶ 46.

ELAP Members "have sought health care . . . at [Intermountain]'s facilities."  Ans. ¶ 10.  ELAP alleges it is aware of what it calls a "standardized, form document" ("Admission Form," referenced as "Admission Agreement" herein)[3] that Intermountain requires Members "to sign before Intermountain provides" them health care.  CC ¶ 30.  ELAP alleges that Members "never agreed to pay Intermountain the amounts Intermountain now contends they owe."  CC ¶ 8.  ELAP alleges that it "has no control over whether [Members] have received or will choose to

---

[2] ELAP refers to the members of ELAP-affiliated ERISA Plans ("Plans") as "Patients." CC ¶ 6.  Because Intermountain has "patients" who are not Members, this Motion uses the term "Members" to refer to participants in ELAP-affiliated Plans, as described in ¶ 6.

[3] The document that ELAP describes as the "Admission Form" appears to be the same document Intermountain references as the "Patient Agreement" in the Complaint.  However, for purposes of this motion only, Intermountain adopts the term "Admission Agreement" to harmonize with the characterization in ELAP's allegations.

receive care at Intermountain facilities."  CC ¶ 35.  ELAP legally defends Members when Intermountain "seeks to collect . . . charges."  Ans. ¶¶ 24–25, 27.

ELAP further alleges that "ELAP and the [Members who ELAP] defends deny the Admission Form is an enforceable contract because [the contract] lacks a material term, *i.e.*, a price term."  CC ¶ 32.  "Alternatively, ELAP and the [Members who ELAP] defends deny the Admission Form obligates [Members] to pay excessive, unreasonable, and unconscionable prices."  CC ¶ 33.   ELAP claims Intermountain provided health care to Members in circumstances where either "(a) Intermountain informed [Members] they would owe a different amount than Intermountain now contends [Members] owe *or* (b) [Members] signed a standardized form drafted by Intermountain that contained no price term, an indefinite price term, or a price term that provided Intermountain unilateral discretion to charge any price it wished, including excessive, unreasonable, and unconscionable prices.  CC ¶ 9.  "Intermountain breaches any contracts with [Members] either by failing to honor express obligations or violating the implied covenant of good faith and fair dealing" by "seeking to collect" from Members the remainder of the balance owed.  CC ¶ 26.

According to ELAP, Intermountain has informed ELAP that Members "entered into and will continue to enter into contractual agreements to pay Intermountain's bills."  CC ¶ 29.  ELAP "does not encourage" Members "to pay [those] . . . charges."  Ans. ¶ 41.  ELAP knows Intermountain "attempts to collect such amounts from" Members.  Ans. ¶ 27.

ELAP "does not have . . . any . . . contractual arrangement with" Intermountain.  Ans. ¶ 20.  The Plans' payments consist "of the Plans' Allowable Claim Limit ("ACL")[4] minus any cost-sharing amounts" the Members pay.  CC ¶ 19.  "Intermountain bill[s]" Members for the remaining balance.  CC ¶ 23.

ELAP alleges that the Plans' and the Members' payments fulfill the Members' "obligations to Intermountain," but does not allege why the Members would owe what was negotiated between the Plan and the Members.  *See* CC ¶ 22; *id.* ¶ 18 ("The Plans remit[] payment . . . pursuant to the **terms and benefits** available to the [Members] **under the Plans**." (emphasis added)).

## LEGAL STANDARD

In considering a motion to dismiss, "[a]ll well-pleaded facts, as distinguished from conclusory allegations, must be taken as true."  *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002).  The motion should be granted if "it appears beyond a doubt that the plaintiff is unable to prove any set of facts entitling her to relief under her theory of recovery."  *Id.* Furthermore, "to survive a motion to dismiss," a complaint must "contain sufficient factual matter, accepted as true, 'to state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim has "facial plausibility" where the content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

---

[4] "The ACL is the greater of (a) the amount Medicare would" reimburse "plus . . . 20%" or (b) Intermountain's cost[s] . . . plus . . . 12% . . . ."  CC ¶ 21.

*Id.* However, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''' *Id.* (internal citations omitted).

## ARGUMENT

## I.  ELAP LACK STANDING TO ASSERT ITS COUNTERCLAIMS AND THE COURT LACKS JURISDICTION TO ADJUDICATE THEM.

ELAP lacks Article III standing and it is barred from seeking any remedies through a manufactured "dispute" about the enforceability of Admission Agreements between Intermountain and Members to which ELAP is a legal stranger and lacks any legal interest.  To establish Article III standing, the claimant

> must have suffered an "injury in fact"—an invasion of a ***legally protected interest*** which is (a) concrete and particularized . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, (1992) (emphasis added) (internal citations omitted) (some alterations in original); *see also Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (reciting elements).

### A.    ELAP Has Not Suffered any "Injury in Fact" that Merits Standing.

ELAP has no standing to sue Intermountain unless it can show it suffered an "injury in fact."  *Tandy,* 380 F.3d at 1283.  The only "injury" ELAP alleges ***it*** has suffered is that "ELAP is contractually obligated to provide a defense" to Members when Intermountain "seeks to collect amounts from [Members] that exceed the ACL's calculated under the terms of the [Members']

Plans."  CC ¶ 31.  ELAP claims it "faces . . . administrative and operational burdens" in

providing such a defense and it incurs "ongoing costs" in doing so.  CC ¶¶ 40, 41.  Such alleged

"injury" is insufficient to confer standing.  As the Fifth Circuit explained, "[t]he mere fact that an

organization redirects some of its resources to litigation and legal counseling in response to

actions or inactions of another party is insufficient to impart standing upon the organization."

*Ass'n for Retarded Citizens v. Dallas Cty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*,

19 F.3d 241, 244 (5th Cir. 1994).  If the law were otherwise, "any sincere plaintiff could

bootstrap standing by expending its resources in response to actions of another," a result that "is

at odds with *Lujan*'s definition of injury in fact as the 'invasion of a legally-protected interest.'"

*Id.* (citing *Lujan*, 504 U.S. at 560).

Here, ELAP alone has voluntarily elected to assume the contractual obligation to defend

Members against collection efforts beyond what ELAP allows.  Neither Intermountain nor any

statute or regulation requires ELAP to defend Members from such collections.  In fact,

Intermountain would obviously prefer ELAP ***not*** expend resources defending Members and has

sued ELAP because that "defense" tortiously interferes with Intermountain's agreements with its

patients.  *See* generally Second Amended Complaint.  Thus, both Intermountain and ELAP agree

ELAP should discontinue spending money on such efforts.

Furthermore, ELAP's allegation that it is "contractually" obligated to provide such a

defense does not change the analysis.  CC ¶ 31.  The fact that ELAP spends money as a result of

its voluntary contracts with third-party Plans is not a legally cognizable injury, it is a self-

inflicted wound.  *See Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125,

131 (D.D.C. 2014) ("An organization's diversion of resources to litigation or to investigation in

anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing.") (citation omitted); *see also D.M. Johnson Family Tr. v. Countrywide Home Loans, Inc.*, No. 2:09-cv-317-DAK, 2009 WL 3615690, at \*4 (D. Utah Oct. 28, 2009) (dismissing claims for lack of standing where plaintiffs "willingly entered into an agreement" with a third party that committed "plaintiffs to make payments on the mortgages" and "nothing" the defendants "did or failed to do ha[d] any bearing" on plaintiffs failure to make payments on the loans).

      In addition, ELAP's allegations are too speculative and conjectural to confer standing. ELAP seeks no relief from Intermountain for any past wrong, but merely seeks to adjudicate against ***future*** conduct based on collections for future health care services that Intermountain has not yet pursued and "defense" costs ELAP has yet to expend. CC ¶¶ 27–46. The Court's focus must be "on past and present injury; possible future injury is insufficient to create standing." *Keyes v. Sch. Dist. No. 1, Denver, Colo.,* 119 F.3d 1437, 1445 (10th Cir. 1997).

      Finally, ELAP's allegations establish that, far from being "injured" as a result of Intermountain's contracts with Members, ELAP ***benefits*** from such agreements. ELAP alleges that it is contracted with Plans to provide "cost containment" services (CC ¶ 6) and ELAP admits that it is compensated for the services it provides. (Ans. ¶ 23). Accordingly, ELAP ***makes money*** when Members visit Intermountain facilities. Noticeably absent is any allegation that ELAP's costs of defending against Intermountain collections have exceeded its profits from rendering "services" when Members use Intermountain facilities. ELAP has suffered no injury.

**B.      Any Alleged Injury to ELAP is Not Traceable to Intermountain.**

The "traceability" element requires "proof of a substantial likelihood that the ***defendants conduct caused plaintiffs injury in fact.***"  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (emphasis added).  If "speculative inferences are necessary to connect [a plaintiff's] injury to the challenged action," this burden has not been met.  *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008).  ELAP plainly cannot meet this requirement because, as discussed above, ELAP's only alleged injury flows from contractual obligations it voluntarily assumed with third-party Plans that are not before the Court.

Furthermore, to satisfy the traceability requirement, the injury must not "result from the independent action of some third party not before the court."  *Nova Health Sys*, 416 F.3d at 1155 (quoting *Lujan*, 504 U.S. at 560).  ELAP's counterclaims fail to meet the traceability requirement because ELAP's alleged injury results from the independent actions of Plans and Members who are not a party to this litigation.  ELAP alleges that its "contractual obligation" to provide a defense is triggered when ***Plans*** pay Intermountain less than its billed charges and Intermountain seeks to collect the difference from Members.  CC ¶¶ 23–24.  In other words, whether ELAP accrues defense obligations does not depend on any action of Intermountain, but solely on what amounts the ***Plans*** chose to pay.  Accordingly, the "cause" of ELAP's alleged "defense" cost injury is not Intermountain's collection activity, but the decision of ***Plans*** to pay less than Intermountain's charges.  The fact that such failure to pay charges may culminate in collection activity that, when reported to ELAP by the Plan, ***then*** triggers ELAP's obligation to provide a defense pursuant to its separate contracts with Plans is not a harm traceable to Intermountain.

The same is true for Members.  As with Plans, it is the independent decision of *Members* to seek care at an Intermountain facility and then refuse to pay Intermountain's charges that ultimately results in collection activity ELAP alleges triggers its defense obligations.  CC ¶ 23.  Importantly, ELAP does not allege Intermountain *causes* such Members to visit Intermountain facilities or refuse to pay Intermountain's bills.  Even ELAP insists it has "*no control* over whether [Members] have received or will chose to receive care at Intermountain facilities."  CC ¶ 35 (emphasis added).  Accordingly, ELAP's alleged "injury" has nothing to do with conduct Intermountain directs toward ELAP, but instead from the choices of non-party Members and their Plans.  Indeed, if ELAP's Members were to choose to discontinue seeking health care from Intermountain for any reason, ELAP would have no alleged injury of any kind because Intermountain would stop collecting money from the Plans or the Members and ELAP would pay nothing to defend them.  *See* CC ¶¶ 23, 24.  Similarly, if Members do continue to visit Intermountain facilities in the future, but do not seek services resulting in charges that trigger ELAP's defense obligation, then ELAP also suffers no injury traceable to Intermountain.

## C. ELAP Has Failed to Plead a Redressable Injury.

ELAP has also failed to plead facts establishing that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan,*  504 U.S. at 561 (citation omitted).  If the Court were to declare that the Admission Agreement does not permit Intermountain to collect its billed charges, which ELAP alleges "were excessive, unreasonable, and unconscionable amounts," CC ¶¶ 23, 36, and enjoins Intermountain from collecting those amounts, CC ¶ 46, ELAP is *still* likely to incur the cost of defending Members.  This is because, according to ELAP, it must provide a defense every time Intermountain seeks to

collect anything beyond its "ACL" amount.  CC ¶ 31.  Indeed, even if Intermountain's charges

are just a dollar more than the "ACL" (and thus indisputably "reasonable" even in ELAP's

world), ELAP would *still* be required to incur defense costs.  Accordingly, because ELAP's

defense "obligation" is tied to the ACL and ***not*** the amount of the health care provider's charges,

a declaratory judgment and injunction precluding the collection of "excessive, unreasonable, and

unconscionable" charges is meaningless as a remedy for ELAP's alleged injury.  This is

particularly true because neither the Court nor Intermountain has any control over how ELAP

calculates the "ACL" amount (or how it negotiates and implements the ACL in its agreements

with Plans). Thus, none of the relief ELAP seeks from the Court can insulate ELAP from

accruing defense costs.  In fact, nothing prevents ELAP from reducing the ACL below a

reasonable charge, thus creating future defense obligations no matter how "reasonable" the

charges.

### D.     The Prudential Standing Doctrine Precludes the Court from Adjudicating ELAP's Counterclaims.

ELAP also lacks prudential standing, and thus cannot litigate whether Intermountain's

charges are "excessive," "unreasonable, "or unconscionable."  CC ¶¶ 36, 46.  The prudential

standing doctrine encompasses various limitations, including "the general prohibition on a

litigant's raising another person's legal rights."  *The Wilderness Soc'y v. Kane Cty.*, 632 F.3d

1162, 1168–71 (10th Cir. 2011) (en banc) (quoting *Allen v. Wright,* 468 U.S. 737, 751 (1984)).

A claimant "generally must assert his own legal rights and interests, and cannot rest his claim to

relief on the legal rights or interests of third parties."  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490,

499 (1975)); *RMA Ventures Cal. v. SunAmerica Life Ins. Co.*, 576 F.3d 1070, 1073 (10th Cir.

2009) ("A well-founded prudential-standing limitation is that litigants cannot sue in federal court

to enforce the rights of others.").  The Tenth Circuit has applied the prudential standing doctrine against claimants seeking to adjudicate contracts to which they are not a party.  *See Sec. Serv. FCU v. First Am. Mortg. Funding, LLC*, 771 F.3d 1242, 1245 (10th Cir. 2014) ("We think this case is easily resolved on the basis that the Defendants, who are neither parties to nor third-party beneficiaries of the [purchase agreement], lack standing to impose their interpretation of it on the parties who are in agreement as to its meaning.")

Here, ELAP is attempting to raise its Members' alleged legal rights by challenging Intermountain's efforts to collect from Members what ELAP describes as "excessive," "unreasonable," and "unconscionable" charges through adjudication of Intermountain's Admission Agreement.  CC ¶¶ 22–23, 26, 29–35, 38–39, 44, 46.  ELAP seeks only to adjudicate the Members' rights, not its own.  Indeed, the declaratory relief ELAP seeks would adjudicate the Admission Agreement's enforceability for *all* Intermountain patients, not just Members of ELAP Plans.  CC ¶ 36.  Such a holding would not only affect ELAP's Members, but virtually every relationship Intermountain has with its patients.

The disconnect between ELAP's alleged "injury" and the relief it seeks vividly illustrates ELAP's lack of prudential standing.  While ELAP touts the burden of "defense" costs as its alleged injury, the declaratory and injunctive relief it seeks has ***nothing*** to do with remedying that injury.  Indeed, ELAP makes no claim whatsoever to recover such costs.  Instead, what ELAP seeks is an adjudication of the Admission Agreement between Intermountain and Members, which is calculated to relieve Members of their obligations to pay Intermountain as agreed, not to remedy ELAP's "injury."  CC ¶¶ 27–46.

## II.   ELAP HAS PLED ONLY FORMS OF RELIEF AND NOT ANY CLAIM ARISING FROM A COGNIZABLE LEGAL INTEREST BETWEEN ELAP AND INTERMOUNTAIN.

The only two "counts" ELAP pled as counterclaims are declaratory judgment, CC ¶¶ 27–36, and permanent injunction, CC ¶¶ 37–46.  Neither is a basis for substantive relief and, therefore, ELAP has failed to state a claim for which relief can be granted.  *See, e.g.*, *Renfro v. City of Bartlesville*, No. 12-CV-208-GKF, 2012 WL 5996376, at *6 (N.D. Okla. Nov. 30, 2012) ("[I]t is clear that regardless of whether plaintiffs seek injunctive or declaratory relief, to survive defendant's Rule 12(b)(6) motion, their Amended Petition must allege a cognizable substantive claim or claims.").  In the absence of substantive claims, dismissal is required.  *See, e.g.*, *Auman v. Kansas*, No. 17-2069-DDC, 2018 WL 587232, at *6 (D. Kan. Jan. 29, 2018) ("Because the court has decided to dismiss all of plaintiff's claims for substantive reasons, he cannot invoke the procedural device provided by the Declaratory Judgment Act.  The court therefore dismisses his declaratory claims.").

### A.   Declaratory Judgment Must Concern a Legal Relation Between the Litigants, and No Such Relation Exists Between ELAP and Intermountain.

The Supreme Court has long held that "the operation of the Declaratory Judgment Act is procedural only" and is limited to "cases of actual controversy."  *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40 (1937); *see also* 28 U.S.C. § 2201.  The "controversy . . . must be one that is appropriate for judicial determination" and "be ***definite and concrete***, touching the ***legal relations of parties*** having adverse legal interests."  *Aetna Life*, 300 U.S. at 240 (emphases added).  Put another way, "[t]he availability of declaratory relief 'presupposes the existence of a ***judicially remediable right***.'"  *Long v. Wells Fargo Bank, N.A.*, 670 F. App'x 670, 671 (10th Cir. 2016) (emphasis added) (quoting *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)).  ELAP

recognized these holdings in its first two motions to dismiss, arguing that Intermountain's counts for declaratory judgment and injunctive relief must be based on substantive rights of action. Mot. Dismiss 24, ECF No. 7 (Feb. 12, 2018) (citing *Long* to argue that declaratory "relief is inherently unavailable if the substantive claim fails as a matter of law"); Partial Mot. Dismiss 23, ECF No. 35 (Oct. 26, 2018).[5]

ELAP's declaratory judgment counterclaim, which seeks to adjudicate rights under contracts to which it is not a party, is not rooted in any right of action from which ELAP is entitled to relief. ELAP's half-hearted claim that Intermountain "breaches any contracts with patients" when it seeks collection beyond ELAP-allowed amounts is insufficient. *See* CC ¶ 26 ("By seeking to collect excessive, unreasonable, and unconscionable amounts from [Members], Intermountain breaches ***any contracts with*** [***Members***] either by failing to honor ***express obligations*** or violating the implied covenant of good faith and fair dealing."). CC ¶ 26 (emphasis added). ELAP has not asserted any substantive cause of action for breach of contract against Intermountain, nor could it. Rather, as ELAP readily concedes, the only contracts at issue are between Intermountain and Members, not between Intermountain and ELAP. CC ¶¶ 26, 30. ELAP further highlights the lack of any contract with Intermountain when it alleges

---

[5] In recognizing that no legal relationship exists between Intermountain and ELAP, Intermountain is not waiving the allegations in its Second Amended Complaint that ELAP is responsible for directing Members to visit Intermountain facilities as an instrument of its fraudulent actions and unlawful business model. To the extent a "relationship" exists between Intermountain and ELAP via admitting and treating Members, it is merely the fruit of ELAP's unlawful activity.

that Intermountain (not ELAP) "contends [Members] entered into and will continue to enter into contractual agreements to pay Intermountain . . . ."  CC ¶ 29.  While ELAP allegedly denies that the Admission Agreement is "is an enforceable contract" (CC ¶ 32), ELAP is not a party to the Admission Agreement and its opinion about the agreement's enforceability is irrelevant.[6]

Plainly, ELAP does not allege a contractual relationship between ELAP and Intermountain.  *See* CC ¶¶ 17–36.  Indeed, Intermountain has pled that there is no contract

---

[6] In Paragraphs 32 and 33 of the Counterclaim, ELAP purports to make allegations about enforcement of the Admission Agreement on behalf of both "***ELAP and the Patients it defends***."  CC ¶¶ 32,33 (emphasis added).  To the extent ELAP may rely on allegations made on behalf of the "Patients it defends" to confer standing or otherwise support its claims, such efforts fail easily.  Members are not parties to the lawsuit and ELAP's speculative allegations about Members' assessment of the enforceability of the Admission Agreement are irrelevant legal conclusions.  Moreover, ELAP offers no allegations establishing that it has ever had the legal right to stand ***in the shoes of Members*** to assert claims against Intermountain arising from Members' direct contracts with Intermountain to which ELAP is not a party.  Indeed, while ELAP may allege that it is contractually obligated to "defend" members when Intermountain seeks collections directly from Members, ELAP does not allege that Members have assigned to ELAP the unlimited right to sue Intermountain on the Members' behalf ***in ELAP's own name*** in a lawsuit to which Members are not a party.  Nor could ELAP reasonably request such an assignment because it would make ELAP's counterclaims *res judicata* as to future Member lawsuits against Intermountain and would terminate the availability of any remedies beyond what ELAP has sought.  No allegations suggest ELAP consulted with, let alone obtained the consent of, ***any*** patient to sue Intermountain on their alleged behalf.  Furthermore, ELAP cannot rely on the blanket assertion that it speaks on behalf of "Patients it defends" because doing so would plainly enable ELAP to make an end-run around the class action requirements of Federal Rules of Civil Procedure 19 and 23.  *See also infra* § III.  Any dispute between Intermountain and the Members who sign the Admission Agreement with the intent not to pay, is not a legal interest ELAP has a right to pursue in its own name.  *See id.*  Indeed, ELAP admits to facts demonstrating that where it has directed lawyers to sue Intermountain to evade payment of health care services, the suits were filed in the name of ***patient,*** without naming ELAP as a party (or even mentioning ELAP in the suit's allegations).  *See* Ans. ¶ 42 (admitting that ELAP directed lawyers to file the case *Musick et al. v. Intermountain Health Care Inc.,* No. 2:15-cv-00450-JNP (D. Utah 2015) to which ELAP is not a party).

between the two parties, and ELAP admits this fact.  Ans. ¶ 20 ("[ELAP] admits it does not have

a . . . any . . . contractual arrangement with [Intermountain].")  Where no contract binds these

two parties, neither party has a viable breach-of-contract claim against the other, and no basis for

declaratory judgment exists.

**B.     No Basis for Injunctive Relief Exists Because ELAP has No Right of Action on Which the Merits Can be Determined.**

ELAP's claim for permanent injunction must also be dismissed.  Among other factors, an

essential—and dispositive—prerequisite to permanent injunction is a showing of "actual success

on the merits'" *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1272 (10th Cir. 2011) (quoting

"*Sw. Stainless, LP v. Sappington,* 582 F.3d 1176, 1191 (10th Cir. 2009)).  Absent a showing that

a party's cognizable legal interest has been violated, the claimant has not succeeded on the merits

and permanent injunction is unavailable.  *Id.*  ELAP recognized this legal reality in its prior

motion to dismiss.  Mot. Dismiss 24 ("[T]he Court should dismiss the claims for declaratory and

injunctive relief against ELAP because the relief sought is dependent upon establishing one or

more of its substantive claims, which [Intermountain] has not done . . . .").

The permanent injunction claim should be dismissed because ELAP states no cause of

action for which it could prevail "on the merits."  It seeks a remedy that is untethered to any

underlying substantive cause of action.  While there are many flaws with ELAP's allegations, the

most obvious failure to state a claim is stated in paragraph 45 wherein ELAP fails to explain

what the "merits of its counterclaims" *are* or how its counterclaims differ from its request for a

permanent injunction.  CC ¶ 45.  Instead, ELAP circularly alleges that it is entitled to a

permanent injunction because "ELAP will succeed on the merits of its Counterclaims."  CC ¶ 45.

But an injunction is merely a remedy, not a substantive claim, and no substantive "merits" exist upon which ELAP can obtain injunctive relief.

ELAP also fails to establish any of the other permanent injunction factors.  For example, ELAP will not suffer "irreparable harm" if an injunction does not issue.  According to ELAP, it will suffer "harm" because it is "contractually" obligated to defend Members against Intermountain collections.  CC ¶ 39.  But an injunction is neither necessary nor sufficient to abate such "harm."  Since Intermountain is a stranger to ELAP's agreements with Plans, it is entirely within ELAP's control ***not to enter into contracts that require it to spend money defending against Intermountain's collections***.  Moreover, because Intermountain does not control the terms of ELAP Plans, an injunction would be an inadequate and insufficient remedy because an injunction cannot stop ELAP from voluntarily contracting its way into, or out of, future "harm" based on Plan terms over which ELAP has exclusive control.  The fact that ELAP has carelessly agreed to Plan terms that require it to spend money defending Members that it does not actually want to spend is ELAP's concern, not Intermountain's.

In addition, the "threatened injury" to ELAP would not outweigh the harm to Intermountain if an injunction issues.  Issuing an injunction premised on the assumption that any amounts beyond what ELAP allows are "excessive, unreasonable, and unconscionable" establishes a precedent applicable not only to ELAP Members, but to any Intermountain patient. *See infra* § IV.  The result is judicial nullification of all agreements that Intermountain has negotiated with insurers and other payors (i.e., preferred provider agreements) under which Intermountain and the payor have agreed that Intermountain should receive for its services an amount greater than what ELAP "allows."  In addition, Intermountain would suffer revenue loss

in such event that would outweigh whatever "administrative and operational burdens" ELAP claims results from paying for Members' defense.  CC ¶ 40.

Finally, an injunction would not serve the public interest.   An injunction that holds up ELAP's "allowable claim limit" as the metric for what all health care should cost and precluding a health care provider from seeking to collect anything beyond what ELAP tells Plans to pay, equates to a judicial decree that any health care pricing that exceeds beyond ELAP's allowance is unlawful and unenforceable.  *See also infra* § III.  Health care policy should be left to the legislative branches of government.  For example, as discussed below, the Utah Legislature has already acted to address concerns about the availability of health care pricing information before patients receive care, rendering moot the fundamental challenge ELAP poses to enforcing the Admission Agreement on the basis that it lacks a price term.  *See e.g.* CC ¶ 9, 33.

## III.   ELAP CANNOT ASSERT MEMBERS' LEGAL RIGHTS WITHOUT JOINING THEM AS PARTIES OR BRINGING A CLASS ACTION.

The Court must dismiss ELAP's counterclaims because ELAP has failed to join necessary and indispensable parties under Federal Rules of Civil Procedure 12(b)(7) and 19 and such Members cannot be joined.  Under Rule 19(a), "the court must order joinder of a party if (1) in that person's absence, the court cannot accord complete relief among existing parties; or (2) failure to join would jeopardize a person's ability to protect himself or expose him to inconsistent adjudications."  *Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1235–36 (10th Cir. 2014).  If the non-party is required, but joinder is infeasible, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  *Id.*; Fed. R. Civ. P. 19(b).

Here, the Members are necessary parties because of all the claims related to whether an enforceable contract exists between Intermountain and the Members.  CC ¶¶ 23, 26, 29–36, 38–43, 46.  Charges are not billed against ELAP.  Ans. ¶ 33.  Adjudication of ELAP's counterclaims effectively decides patients' rights under their agreements with Intermountain even though nothing suggests that even ELAP's Members seek such an adjudication or that they concur with ELAP's counterclaim allegations.  Nevertheless, ELAP's attack against Intermountain jeopardizes the Members' potential rights and defenses.  For example, although ELAP alleges that "ELAP and its [Members]" deny that the Admission Agreement is enforceable because it lacks a price term, this allegation is mere hearsay with respect to Members' opinions and ELAP has established no legal basis to speak on the Members behalf.  CC ¶ 32–33.  It is equally probable that Members, upon learning of ELAP's fraudulent business model and the fact that ELAP uses Members to advance it, will agree with Intermountain that ***ELAP*** should be held responsible for any unpaid charges.  Indeed, while ELAP alleges its Members deny the Admission Agreement is unenforceable because it lacks a price term (CC ¶ 32), it fails to allege that it informed Members that the Utah Legislature has already responded to ELAP's alleged concern by allowing consumers to learn health care prices prior to seeking admission to a health care facility.  *See infra* § III.

Furthermore, adjudication of the Members' Admission Agreements without joining them to the lawsuit is prejudicial to Intermountain.  In any lawsuit over medical billing, Intermountain is entitled to litigate directly against the patient, and assert specific defenses and counterclaims particular to such patients.  Adjudicating ELAP's Counterclaims robs Intermountain of the right to raise defenses and counterclaims because it seeks a blanket adjudication without joining

individual patients.  As a result, "the court cannot accord complete relief among existing

parties."  Fed. R Civ. P. 19(a)(1)(A).  Furthermore, in the absence of joinder, Intermountain

remains vulnerable to lawsuits brought by individual Members who are not parties to the lawsuit

and Intermountain would be "subject to a substantial risk of incurring double, multiple, or

otherwise inconsistent obligations because of that interest."  *Id.* at R. 19(a)(1)(B)(ii).

Although the Members are necessary parties, ELAP's counterclaim must be dismissed

because it has failed to plead the "reasons for nonjoinder" as required under Rule 19(c).

Furthermore, ELAP's counterclaims must be dismissed because Members cannot be joined in

"equity and good conscience" in all events.  Intermountain has estimated that it has treated at

least "hundreds of ELAP-affiliated Plan members."  SAMC ¶ 40.  It is not feasible to join so

many individual patients with so many individualized medical billing issues in a lawsuit that is

directed at ELAP's unlawful business model.  Diversity jurisdiction would also be destroyed.

As ELAP knows, the appropriate vehicle for asserting the claims of "hundreds" of

patients, is a Rule 23 class action.  ELAP, however, cannot meet the significant pleading

requirements Rule 23 imposes to demonstrate numerosity, commonality, typicality, and

adequacy by attempting to adjudicate in its own name the interests of parties to a contract to

which it is a legal stranger.  Nothing ELAP alleges establishes that it has any entitlement to avoid

the requirements of Rule 23.

## IV.  THE COURT SHOULD DECLINE ELAP'S INVITATION TO ESTABLISH HEALTH CARE PRICING POLICY.

ELAP's counterclaims ask the Court to invalidate Intermountain's Admission

Agreement, and bar Intermountain from collecting "excessive," "unreasonable" or

"unconscionable" amounts.  CC ¶ 36, 46.  According to ELAP, the exclusive measure of what

constitutes a "reasonable" payment is tied to the payment methodology ELAP employs, which refers to Medicare pricing and/or provider-reported costs as a baseline for determining Plan payments to determine the "ACL."  CC ¶ 21.  ELAP claims the ACL is "equal to or greater than" the "reasonable value of the health care" provided to Members.  CC ¶ 20.  While the remedies sought in ELAP's counterclaims speak to the alleged enforceability of the Admission Agreement (to which ELAP is not a party), the Court cannot ignore the broader reality of what ELAP seeks. In alleging the ACL is "equal to or greater than" the "reasonable" value of health care received, ELAP is asking the Court to affirm the ACL as the only measure of whether a provider's charges are "excessive," "unreasonable," or "unconscionable."  *Id.* at ¶¶ 20–23.  Indeed, ELAP does not allege the existence of any circumstance where a provider would be entitled to **any** payment beyond the ACL.

The implications of ELAP's counterclaims reach far beyond this case and would embroil the Court in creating a *de facto* national health care pricing regime based on ELAP's attempt to invalidate the Admission Agreement because it does not state a specific price for health care services at the time of facility admission.   But the Court need not wade into such waters because the Utah Legislature has already acted to provide consumers access to health care prices before care is received through the Utah Health Care Facility Licensing and Inspection Act.  Utah Code Ann. § 26-21-1, *et seq.* The Act permits consumers to request the list of prices charged by a facility for both in-patient and out-patient procedures **before** they seek care.  Utah Code Ann. § 26-21-27.  Not only does the statute address access to pricing information prior to seeking admission, it allows patients to compare prices among facilities.  In addition, the Act also requires facilities to provide patients with an itemized statement of services provided and the

accompanying charges *after* care is provided, thus allowing patients to correlate the care received with the charges accrued.  *Id.* at § 26-21-20.  Particularly where the legislature has already acted by statute to address the issue at the heart of ELAP's counterclaims, the Court can readily refuse to apply ELAP's common law attacks on the Admission Agreement.

If, instead, the Court chooses to accept as true ELAP's allegations that the ACL is "equal to or greater" than the "reasonable" value of health care received, this *necessarily* means that any charges beyond the ACL are inherently "excessive," "unreasonable," or "unconscionable."  This is true even if a patient otherwise has advance notice of the charges or if an insured patient's provider has agreed in advance to pay beyond ELAP's "ACL."  Consequently, any remedy that summarily forbids Intermountain from collecting "excessive," "unreasonable," or "unconscionable" charges carries with it the inescapable conclusion that the ACL represents the upper limit of what a health care provider can charge in all circumstances.

While such a ruling might delight ELAP, it would wreak havoc across the nation's health care system. The result would be that *any* patient of *any* health care provider could cite the Court's ruling as a basis to refuse to pay any charges exceeding what would be allowed under ELAP's methodology.  This is true because, in ELAP's world, any charge beyond the ACL is *per se* "unreasonable."  CC ¶¶ 21–23.  Moreover, if ELAP's logic applies to Intermountain, it is equally applicable to every other provider that charges more than the ACL.  Thus, turning ELAP's view into law is tantamount to entering a judicial decree that sets the maximum amount any health care provider can charge any patient nation-wide.  Such an outcome would not only impact Members of self-funded plans that affiliate with ELAP, but *every* patient — including patients with traditional insurance.  Indeed, if the Court determined that provider collections of

anything beyond the ACL are "unconscionable," it would be unlawful for a provider to seek such collections in any case, even where a provider's agreement with an insurer requires a reimbursement rate that exceeds the ACL.

The consequence of making such a sweeping change in health care policy through judicial fiat cannot be overstated.  In addition to nullifying countless contractual relationships that rely on payment methodologies *other* than the ACL, it would fundamentally divest the legislative branch of its prerogative to guide the course of health care policy.  It is simply not this Court's job to regulate the health care industry through price controls in the same way, for example, that legislatures regulate public utilities.  Courts have long recognized that it is for legislatures to determine whether a business or industry should be regulated and for the government to set generally applicable prices for all payers and sellers.  *Nebbia v. New York*, 291 U.S. 502, 537 (1934) ("So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare . . . ."); *Munn v. Illinois*, 94 U.S. 113, 133 (1876) ("[I]t has been customary from time immemorial for the legislature to declare what shall be a reasonable compensation under [public utilities], or, perhaps more properly speaking, to fix a maximum . . . .").  ELAP asks the Court to bypass this well-established utility and rate-setting precedent and adopt ELAP's ACL—that is, any charges greater than either 20% more than Medicare's rates or 12% more than the allegedly stated costs.  Courts, however, are simply not equipped to set rates in a regulated market.  *See Duquesne Light Co. v. Barasch,* 488 U.S. 299, 310–16 (1989) ("The economic judgments required in rate proceedings are often *hopelessly complex* and do not admit of a single correct result.") (emphasis added)).

While many diverse opinions exist about how to address and reform health care policy, no one, save ELAP, reasonably believes it is this Court's role to do so. Issuing an order that effectively adjudicates health care pricing in Utah and elsewhere would reach vastly beyond the Court's authority and is certain to be invalidated. *See Flast v. Cohen*, 392, U.S. 83, 95 (1968) (the cases-and-controversies limitation in Article III "define[s] the role assigned to the judiciary . . . to assure that the federal courts will not intrude into areas committed to the other branches of government."). If the federal courts were "to expand their power so as to bring under their jurisdiction ill-defined controversies over constitutional issues, they would become the organ of political theories. Such abuse of judicial power would properly meet rebuke and restriction from other branches." *United Pub. Workers v. Mitchell*, 330 U.S. 75, 90–91 (1947) (emphases added).

## CONCLUSION

For the reasons discussed above, the Court should dismiss all of ELAP's counterclaims with prejudice.

RESPECTFULLY SUBMITTED this 19th day of December 2018.

**MANNING CURTIS BRADSHAW & BEDNAR PLLC**

**/s/ Chad R. Derum**
Alan C. Bradshaw
Chad R. Derum
*Attorneys for Plaintiff IHC Health Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I will cause a true and correct copy of the foregoing to be served in the method indicated below to the below-named parties on December 19, 2018.

___HAND DELIVERY
___U.S. MAIL
___FAX TRANSMISSION
___E-MAIL TRANSMISSION
 x  CM/ECF

John W. Mackay
Brett L. Tolman
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111

*Attorneys for Defendant*


___HAND DELIVERY
___U.S. MAIL
___FAX TRANSMISSION
___E-MAIL TRANSMISSION
 x  CM/ECF

Stephen E.W. Hale
shale@parrbrown.com
Bentley J. Tolk
btolk@parrbrown.com
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT 84111

*Attorneys for Defendant*


**/s/ Chad R. Derum**